CARL H. OSAKI        4008-0
Attorney At Law, A Law Corporation
Town Tower #17G
225 Queen Street
Honolulu, Hawaii  96813
Telephone:  (808) 528-4666
carl@chosaki.com

Attorney for Plaintiff
GLENN SEXTON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| GLENN SEXTON, | ) | CIVIL NO. 1:24-cv-188 |
| | ) | |
|         Plaintiff, | ) | |
| | ) | PLAINTIFF GLENN SEXTON'S |
|    vs. | ) | MEMORANDUM IN OPPOSITION TO |
| | ) | "DEFENDANT'S MOTION TO STAY |
| XEROX CORPORATION, | ) | PLAINTIFF'S CASE AND TO |
| | ) | COMPEL ARBITRATION," FILED |
|       Defendants. | ) | JULY 8, 2024; DECLARATION OF |
| | ) | GLENN SEXTON; DECLARATION OF |
| | ) | CARL H. OSAKI; EXHIBIT "1;" |
| _____ | ) | CERTIFICATE OF SERVICE |

TABLE OF CONTENTS

PAGE

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . 1

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . 1

     A.   The Underlying Case . . . . . . . . . . . . . . 1

     B.   Xerox's Attempt To Unilaterally Impose The
          Arbitration Agreement On U.S. Non-Union
          Employees . . . . . . . . . . . . . . . . . . . 2

          1.   The April 14, 2023 Email To Managers
               About The Arbitration Agreement, Which
               Sexton Never Opened Nor Read . . . . . . . . . 2

          2.   The April 19, 2023 Email To U.S. Non-
               Union Employees, Contained A Hyperlink
               To The MAA Which Sexton Never Clicked;
               Sexton Did Not See Nor Read The MAA And
               Did Not "Acknowledge" Nor Agree To Its
               Terms . . . . . . . . . . . . . . . . . . . 5

          3.   Sexton Does Not Recall Accessing The
               Hyperlink To The American Arbitration
               Association Overview, And Did Not Read
               It, Whatever It May Say . . . . . . . . . . . 8

          4.   Sexton Did Not Read A June 5, 2023 Email
               That Purportedly Was A Follow-Up To Him,
               And Sent To Him Because He Did Not
               Complete The MAA Acknowledgment In The
               Learning Module In GEMS. . . . . . . . . . . 9

          5.   Xerox Knew That Sexton Did Not Open
               Exhibit "A;" Did Not Review The
               "Discussion Guide" To Address Those Who
               Did Not "Acknowledge" The MAA; Did Not
               Attend A Manager Training Session; Did
               Not Click The Link To The MAA In Exhibit
               "C" And Did Not Read It; And Did Not
               Complete The Assignment In GEMS,
               Including "Acknowledging" The MAA; And
               In Response, Xerox Did Nothing . . . . . . . 11

III. ARGUMENTS. . . . . . . . . . . . . . . . . . . . . 13

    A.   The MAA Is Not Valid And Enforceable As To
       Sexton Because Sexton Did Not Agree To It,
       And There Is No Evidence Of An Unambiguous
       Intent On Sexton's Part To Be Bound By The
       Terms Of The MAA . . . . . . . . . . . . . . . 13

        1.   The General Legal Framework And Burden
            Of Proof

            . . . . . . . . . . . . . . . . . . . 13

        2.   Hawaii Law On The Elements Of A Valid
            Arbitration Agreement . . . . . . . . . . 13

        3.   There Is No Objective Evidence Of An
            Unambiguous Intent To Be Bound By The
            MAA On The Part Of Sexton . . . . . . . . 14

    B.   Xerox Is Responsible For The Absence Of Objective
       Evidence Of An Unambiguous Intent On The Part Of
       Sexton To Be Bound By The MAA . . . . . . . . . . 16

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . 20

TABLE OF AUTHORITIES

PAGE(S)

CASES

Douglass v. Pflueger Hawaii, Inc.,
    110 Haw. 520, 531, 135 P.3d 129, 140 (2006) . . 14, 18, 19

Lowden v. T-Mobile USA, Inc.,
    512 F.3d 1213, 1217 (9th Cir. 2008) . . . . . . . . . 13

Norcia v. Samsung Telecomms. Am., LLC,
    845 F.3d 1279, 1283 (9th Cir. 2017) . . . . . . . . . 13

Siopes v. Kaiser Found. Health Plan, Inc.,
    130 Haw. 437, 446, 312 P.3d 869, 878 (2013) . . 13, 18, 19

Southern Glazer's Wine & Spirits, LLC v. Denyer,
    Civil No. 17-00407 (D. Haw. Dec. 15, 2017 . . . 13, 17, 18

STATE STATUTES

Hawaii Revised Statute § 388-11 . . . . . . . . . . . . 2

Hawaii Revised Statutes § 388-10 . . . . . . . . . . . . 2

PLAINTIFF GLENN SEXTON'S MEMORANDUM IN OPPOSITION TO
"DEFENDANT'S MOTION TO STAY PLAINTIFF'S CASE AND
<u>TO COMPEL ARBITRATION," FILED JULY 8, 2024</u>

I.   <u>INTRODUCTION</u>

      Plaintiff Glenn Sexton ("Sexton"), by and through his counsel, opposes "Defendant's Motion To Stay Plaintiff's Case And To Compel Arbitration," filed July 8, 2024 ("Motion"). There is no binding agreement between Sexton and Defendant Xerox Corporation ("Xerox") to arbitrate this, or any other dispute, between them. All that exists is a unilateral declaration by Xerox that disputes between it and its employees shall be arbitrated. Sexton did not see the arbitration "agreement;" did not acknowledge it; and did not agree to it. There being no unambiguous intent to be bound by the terms of an arbitration agreement by Sexton, the Motion should be denied.

II. <u>FACTS</u>

    A.   <u>The Underlying Case</u>

      This action involves a breach by Xerox of the contract of March 29, 2019, which increased Sexton's salary to $260,000 per annum, or to $21,666.67 per month, so long as Sexton remained employed through 2019. The increase was effective April 1, 2019. Sexton remained employed throughout 2019 and beyond, until he was terminated on February 29, 2024, after forty-three years of service to Xerox. Sexton was not paid the full amount of the salary increase from April 1, 2019, to the date of his last pay check from Xerox.

This action includes claims under Hawaii's wage statute, Chapter 388 of the Hawaii Revised Statutes, which provides for the recovery of the unpaid wages; a penalty equal to the amount of unpaid wages; statutory interest on the unpaid amounts; and reasonable attorneys' fees and costs.  See Haw. Rev. Stat. §§ 388-10 & 388-11.

     B.    Xerox's Attempt To Unilaterally Impose The Arbitration Agreement On U.S. Non-Union Employees

         1.    The April 14, 2023 Email To Managers About The Arbitration Agreement, Which Sexton Never Opened Nor Read

Jahmin Morgan of Xerox ("Morgan") swears that an email "identical to" Exhibit "A" was "sent to" Sexton on April 14, 2023.  See Declaration of Jahmin Morgan ("Morgan Declaration"), at 2, ¶4.  Exhibit "A" indicates that it was "sent to all managers of U.S. non-union employees," but does not show, on its face, that it actually was sent to Sexton.

Exhibit "A" announced the following: "Next week, we will introduce a new Mutual Arbitration Agreement (MAA) for all non-union employees based n the U.S. to help further these objectives."  Exhibit "A" notified "people managers" of the following:

    People Managers,

    As we return Xerox to growth, we are taking steps to improve the employee experience and make it easier to work within Xerox.  This includes improving processes to reduce complexity while continuing to operate with integrity and fairness in everything we do.

2

Part of this is ensuring that when conflicts arise, we have clear and consistent processes in place that encourage fair and timely resolution while maintaining flexibility and respecting individuals' confidentiality and privacy.

Next week, we will introduce a new Mutual Arbitration Agreement (MAA) for all non-union employees based in the U.S. to help further these objectives.  This agreement will require arbitration rather than litigation when legal disputes arise with current or former employees.  Arbitration relies on an independent, neutral arbitrator from the American Arbitration Association to study the case, receive evidence, and then make a binding decision.

U.S. non-union employees will receive a message that includes the agreement and a set of Frequently Asked Questions that provide additional context on the purpose of the agreement and how it benefits all parties in a potential dispute.  In addition, they will be asked to acknowledge they have reviewed the agreement by its effective date of May 15, 2023.

If your team members have not acknowledged the agreement as the effective date approaches, you will be notified and prompted to follow-up with these individuals using this discussion guide.  Please note that you will also receive weekly reports from Learning@Xerox with a status of your direct reports' training progress as the due date approaches as well as any overdue assignments.

**Join a Manager Briefing Session**

Please plan to attend one of the following briefing sessions so you can learn more about the MAA, its purpose, and how it benefits all parties in a potential dispute.  To save a session to your calendar, click on the session link, open the file, and download it to your calender.

- Session 1: Monday, April 17 from 4 to 4:30 ET
- Session 2: Tuesday, April 18 from 1 to 1:30 ET
- Session 3: Wednesday, April 19 from 8:30 to 9:00 ET

3

Thank you for your continued support and valued
contributions.
Suzan Morno-Wade
EVP and Chief Human Resources Officer

<u>See</u> Exhibit "A" to the Motion.

Exhibit "B" shows that Sexton did not "click" nor "open" Exhibit "A."[1]  <u>See</u> Morgan Declaration, at 2, ¶5. Obviously, Sexton did not read the contents of Exhibit "A."  <u>See</u> Declaration of Glenn Sexton ("Sexton Declaration"), at 1, ¶2.

Furthermore, Sexton was never notified to open and read Exhibit "A" and to thereafter follow up with any subordinates about "acknowledging the agreement."  <u>Id</u>., at ¶3.

In addition, Sexton never received any "weekly reports from Learning@Xerox with a status" of his "direct reports' training progress . . . as well as any overdue assignments." <u>Id</u>., at 2, ¶4.

Sexton never signed up for, or attended a briefing session, and was never asked to do so.  <u>Id</u>., at ¶5.  After April 14, 2023, Sexton was never asked by his superiors to sign up for and attend a briefing session, nor was Sexton asked to follow up with any of his subordinates about their training

---

[1]The Motion does not explain "clicks" and "opens."  "Opens" indicate when someone looks at an email.  "Clicks" indicate when someone "clicks" on a link within an email.  <u>See</u>, <u>e.g.</u>, https://www.fosterwebmarketing.com/faqs/difference-between-clicks
-and-opens-in-an-email-campaign.cfm#:~:text=%E2%80%9CClicks%2C%E2
%80%9D%20%E2%80%9Cclick%2D,through%20to%20your%20target%20page.

progress, any overdue assignments, and "acknowledging the agreement."  Id., at ¶6.

Moreover, Exhibit "A" did not disclose when or how U.S. non-union employees of Xerox ever purportedly agreed to be bound by the terms of the purported "Mutual Arbitration Agreement" ("MAA").  Instead, the language of Exhibit "A" objectively indicated that, as of April 14, 2023, U.S. non-union employees *did not even know about* the MAA.  See Exhibit "A" ("Next week, we will *introduce* a new Mutual Arbitration Agreement . . . ." [italics added]).

2.  The April 19, 2023 Email To U.S. Non-Union Employees, Contained A Hyperlink To The MAA Which Sexton Never Clicked; Sexton Did Not See Nor Read The MAA And Did Not "Acknowledge" Nor Agree To Its Terms

Morgan swears that an email was sent to all Xerox U.S. non-union employees, including Sexton, via the Poppulo platform on April 19, 2023.  See Morgan Declaration, at 2, ¶¶ 6-7.  Morgan swears that the "text of" the April 19, 2023 email was attached to the Motion as Exhibit "C."  Id., at 2, ¶6.  Exhibit "C" indicates that it was "sent to all U.S. non-union employees," but

5

does not show, on its face, that it actually was sent to Sexton.[2]

Exhibit "C" announced the following:

> Dear Colleagues,
>
> As we work together to return Xerox to growth, we are
> taking steps to improve the employee experience and
> make it easier to work within Xerox.  This includes
> improving processes to reduce complexity while
> continuing to operate with integrity and fairness in
> everything we do.
>
> Part of this is ensuring that when conflicts arise, we
> have clear and consistent processes in place that
> encourage fair and timely resolution while maintaining
> flexibility and respecting individuals' confidentiality
> and privacy.
>
> To help further these objectives, we are introducing a
> new Mutual Arbitration Agreement (MAA) for all non-
> union employees based in the U.S.  The MAA provides a
> consistent approach to resolving legal conflicts that
> may arise between an employer and employee through
> arbitration.
>
> At Xerox, we believe arbitration provides a faster,
> easier, and more cost-effective way for both our
> employees and the company to resolve any legal disputes
> that may occur.  Arbitration relies on an independent,
> neutral arbitrator from the American Arbitration
> Association to study the case, receive evidence, and
> then make a binding decision.  Agreements of this type
> are common across industries; approximately 70 percent
> of large private sector employees including HP, GE,
> FedEx, and Pfizer have mandatory arbitration agreements

---

[2]The time that Exhibit "C" was purportedly sent to Sexton is
unknown and ambiguous, at best.  Exhibit "C" states that it was
sent at 2:11 p.m.  However, in a letter dated May 10, 2024,
Jeffrey J. Harradine of the Office of General Counsel of Xerox
represented that an email "representative of what was sent" to
Sexton on April 19, 2023, was sent at 3:11 p.m. See Declaration
of Carl H. Osaki, at its Exhibit "1."  Neither version of the
April 19, 2023 email shows that it was actually sent to Sexton.
Morgan swears that it was sent to Sexton at 7:10 p.m. (UTC). See
Morgan Declaration, at 2, ¶ 7.

in place.  You can learn more about the process in this
overview from the American Arbitration Association.

**Please read and acknowledge the terms of the MAA by May
15, 2023.**  The agreement requires arbitration of most
legal disputes between Xerox and employees after this
date.

1. Click here to read the MAA.
2. Visit your Learning Dashboard in GEMS* to
   complete the assigned MAA23 - Mandatory
   Arbitration Agreement training module; the
   module allows you to acknowledge that you
   have reviewed the terms of the MAA.

For more details about the MAA, click here for a set of
Frequently Asked Questions; they provide additional
context on the purpose of the agreement and how it
benefits all parties in a potential dispute.  If you
have other questions, you may contact myHRconnection.

Suzan Morno-Wade
EVP and Chief Human Resources Officer
*Note: The login process for GEMS changed on April 15.
Click here for more information.*

See Exhibit "C" to the Motion.

Exhibit "C" "introduces" the MAA to U.S. non-union
employees.  In order to see and read the MAA, an employee like
Sexton had to click on a hyperlink within Exhibit "C" in order to
access the MAA and to read its text.  There is no other way to
know what the MAA looks like, or says.

Sexton did not see, nor did he read, the MAA prior to
May 15, 2023, nor at any time during the period he was employed
at Xerox.  In fact, Sexton did not see the MAA until after this
civil action was initiated on April 25, 2024.  See Sexton
Declaration, at 2, ¶ 7.  Xerox does not dispute this.  See Morgan

7

Declaration, at 3-4, ¶¶ 12-15 (no evidence that Sexton clicked on the hyperlink in Exhibit "C" which accesses the MAA).[3]

Otherwise, Exhibit "C" does not state how the terms of the MAA were negotiated, nor how both sides unambiguously accepted the terms of the MAA.  This is because there was no negotiation and there was no mutual acceptance of the terms of the MAA.  See Sexton Declaration, at 2, ¶ 8.  The MAA was "introduced" to U.S. non-union employees on April 19, 2023, and Xerox attempted to unilaterally impose the MAA on them without their agreement.  Exhibit "C" to the Motion contains no instructions on how a U.S. non-union employee is supposed to "accept" the terms of the MAA.

    3.    Sexton Does Not Recall Accessing The Hyperlink To
          The American Arbitration Association Overview, And
          Did Not Read It, Whatever It May Say

---

[3]In her sworn declaration, Morgan swears that *Sexton* opened Exhibit "C" "on eight separate occasions," and "clicked" two hyperlinks in Exhibit "C," which are hyperlinks to "the American Arbitration Association overview" and to "myHRconnection."  See Morgan Declaration, at 3, ¶ 12.  Morgan assumes too much because she cannot testify as to who "opened" or looked at, Exhibit "C;" how long it remained open; and whether whoever opened it actually read it on any of the occasions that it was opened.
    Sexton's practice was to have his administrative assistant review emails sent to his Xerox email address.  See Sexton Declaration, at 2-3, ¶ 9.  Sexton does not recall whether he personally opened Exhibit "C."  Id.  Sexton was generally aware  that Xerox was trying to impose an arbitration agreement, but did not believe that Xerox could do that without obtaining an agreement first.  Id.  Sexton knew that it was Xerox's practice to follow up when it really wanted something accomplished. No one followed up with Sexton throughout his employment with Xerox about Exhibit "C" or about the MAA.

Sexton did not review the American Arbitration Association ("AAA") overview.  <u>See</u> Sexton Declaration, at 3-4, ¶ 12.  Contrary to Morgan's declaration, Sexton does not even recall clicking the hyperlink to the AAA overview in Exhibit "C." <u>See</u> Sexton Declaration, at 3-4, ¶ 12.  Whatever the AAA overview may say, it apparently is not material because it is not an exhibit to the Motion.[4]

    4.    Sexton Did Not Read A June 5, 2023 Email That Purportedly Was A Follow-Up To Him, And Sent To Him Because He Did Not Complete The MAA <u>Acknowledgment In The Learning Module In GEMS</u>

Morgan swears that a follow up email was sent to Sexton on June 5, 2023, because Sexton "did not complete the MAA acknowledgement [sic] in the learning module."  <u>See</u> Morgan Declaration, at 4, ¶ 18.  Morgan swears that a "copy of the template and text of the June 5, 2023 email" is attached to the Motion as Exhibit "J."  <u>Id</u>., at 5, ¶ 18.  Exhibit "J" is labeled a "Test Email" and indicates that it was "sent to all employees who were assigned but did not complete the Mutual Arbitration Agreement acknowledgment in GEMS."  <u>See</u> Exhibit "J" to the

_____

[4]For some reason, Xerox deemed it material to make two documents exhibits which Sexton did not click on, and never saw nor read.  One of those documents is the MAA.  The other document is the "Frequently Asked Questions" ("FAQ") about the MAA.  <u>See</u> Exhibit "E" to the Motion.  **Exhibit "E" makes it clear that there was no agreement by any U.S. non-union employee to be bound by the MAA**.  For example, a frequently asked question was: "Who <u>is</u> <u>being asked to agree to be bound</u> by the MAA?"  <u>See</u> Exhibit "E" (italics added).  Another frequently asked question was: "<u>If I</u> <u>agree to be bound</u> by the MAA, . . . ."  <u>Id</u>. (italics added).

9

Motion.  Exhibit "J" does not show who it was sent to, nor when it was sent; and, on its face, does not show that it actually was sent to Sexton.  <u>Id</u>.[5]

It is also disputed that Exhibit "J" was "opened" by Sexton on "two occasions."  <u>See</u> Morgan Declaration, at 5, ¶ 19. Sexton did not see nor read Exhibit "J" and was unaware of any "follow up" email sent to him on account of his not completing the MAA acknowledgment in the learning module on GEMS.  <u>See</u> Sexton Declaration, at 3, ¶ 10.  Sexton's practice was to have his administrative assistant review his emails.  <u>Id</u>., at 2, ¶ 9. In addition, "click reports" have been known to be inaccurate. <u>Id</u>., at 3, ¶ 11.

---

[5]This is not an idle observation.  Whether Exhibit "J," or something like it, was actually sent to Sexton is a real issue. In the Motion, Morgan swears that a follow up email was sent to Sexton on *June 5, 2023*.  <u>See</u> Morgan Declaration, at 4, ¶18.  In contrast, Xerox's general counsel has stated that it was sent to Sexton on *May 8, 2023*.  <u>See</u> Exhibit "1," at 2.  Another version of Exhibit "J," which is included in Attachment 2 to Exhibit "1," stated that it was sent to unknown recipients on *May 8, 2024*. <u>See</u> Exhibit "1," at its Attachment 2.  Thus, it is not known when, or whether, Exhibit "J" was actually sent; when; and to whom.

5.      Xerox Knew That Sexton Did Not Open Exhibit "A;"
        Did Not Review The "Discussion Guide" To Address
        Those Who Did Not "Acknowledge" The MAA; Did Not
        Attend A Manager Training Session; Did Not Click
        The Link To The MAA In Exhibit "C" And Did Not
        Read It; And Did Not Complete The Assignment In
        GEMS, Including "Acknowledging" The MAA; And In
        <u>Response, Xerox Did Nothing</u>

Xerox tried to impose, by fiat, the MAA upon U.S. non-union employees, which included Sexton.  Exhibits "A" and "C" contain no instructions on how to affirmatively accept the terms of the MAA.  A U.S. non-union employee like Sexton had to access the MAA via a hyperlink in Exhibit "C;" open the MAA; read the MAA; and understand the contents of the MAA, all in order to realize that the only affirmative action Xerox provided, was a way to *reject* the terms of the MAA by leaving employment by May 15, 2023.  Sexton never knew any of that, because he did not click the hyperlink in Exhibit "C," and thus, never saw or read the MAA.  Xerox knew that Sexton did not read the MAA.  Xerox knew that Sexton did not "acknowledge" the MAA.

Knowing all of that, Xerox did nothing.  Xerox purportedly deemed it important that U.S. non-union employees read and understand the MAA and acknowledge that fact.  <u>Cf</u>. Exhibit "L."  Xerox put steps in place to make sure that U.S. non-union employees "acknowledged" the MAA.  <u>Cf</u>. Exhibit "A" (superiors would be provided with weekly status reports of those employees who did not complete the "acknowledgment," and would be instructed to follow up with such delinquent employees; Xerox

provided a discussion guide for the follow up with such employees).

Xerox was constrained to proceed in this fashion because it provided no method to affirmatively accept the terms of the MAA, and only provided a means to reject the MAA which was within the text of the MAA itself. Thus, it was imperative for Xerox to be able to show that a U.S. non-union employee read and understood the MAA. It did this through the "acknowledgment" in the GEMS learning module.

Xerox knew that Sexton did not see nor read the MAA. Xerox knew that Sexton did not "acknowledge" the MAA; how could he have done so, never having even seen it? Xerox knew that Sexton did not know how "to reject" the MAA. Xerox knew that Sexton's employment after May 15, 2023, was not an indication that Sexton "accepted" the MAA because the only affirmative thing an employee could do was to leave employment in order to "reject" the MAA and Sexton did not know that.

Xerox was not handcuffed by its own plan. Not knowing Sexton's actual intent as to the MAA, Xerox could have asked. Xerox never clarified. Xerox never asked.

12

III. <u>ARGUMENTS</u>

    A.    <u>The MAA Is Not Valid And Enforceable As To Sexton
Because Sexton Did Not Agree To It, And There Is No
Evidence Of An Unambiguous Intent On Sexton's Part To
Be Bound By The Terms Of The MAA</u>

        1.    <u>The General Legal Framework And Burden Of Proof</u>

The law may favor the enforcement of valid arbitration agreements, <u>see</u> Motion, at 7, but the law requires that a "'valid agreement to arbitrate exists.'"  <u>See</u> <u>Southern Glazer's Wine & Spirits, LLC v. Denyer</u>, Civil No. 17-00407 (D. Haw. Dec. 15, 2017) (Order Granting Petition to Compel Arbitration, quoting <u>Lowden v. T-Mobile USA, Inc.</u>, 512 F.3d 1213, 1217 (9th Cir. 2008)).  Here, there is no valid agreement to arbitrate.

The determination of whether a valid agreement to arbitrate exists is dependent on ordinary state law principles of contract formation.  <u>Id</u>., at 7-8 (citing <u>Norcia v. Samsung Telecomms. Am., LLC</u>, 845 F.3d 1279, 1283 (9th Cir. 2017).

Xerox carries the burden of proving the existence of a valid arbitration agreement.  <u>Id</u>., at 8 (quoting <u>Siopes v. Kaiser Found. Health Plan, Inc.</u>, 130 Haw. 437, 446, 312 P.3d 869, 878 (2013)).  In this action, Xerox cannot carry its burden and the Motion should therefore be denied.

        2.    <u>Hawaii Law On The Elements Of A Valid Arbitration
Agreement</u>

Hawaii law requires Xerox to prove the three elements of a valid arbitration agreement:

"(1) it must be in writing; (2) it must be unambiguous
as to the intent to submit disputes or controversies to
arbitration; and (3) there must be bilateral
consideration."

Id., at 9 (quoting Siopes, 130 Haw. at 447, 312 P.3d at 879,
which quotes Douglass v. Pflueger Hawaii, Inc., 110 Haw. 520,
531, 135 P.3d 129, 140 (2006)).

The facts are devoid of the unambiguous intent to be
bound by the MAA on the part of Sexton.  It follows that the
other two elements are absent as well.

> 3.    There Is No Objective Evidence Of An Unambiguous
>        Intent To Be Bound By The MAA On The Part Of
>        Sexton

Hawaii law requires the following to be proven by
Xerox:

> For the second element, "there must be a mutual assent
> or a meeting of the minds on all essential elements or
> terms to create a binding contract."  Siopes, 130 Haw.
> at 447, 312 P.3d at 879 (citation and emphasis
> omitted).  "The existence of mutual assent or intent to
> accept is determined by an objective standard."
> Douglass, 110 Haw. at 531, 135 P.2d at 140.

Id.

Xerox assumes too much when it points to the MAA itself
as providing that proof, because it is undisputed that Sexton did
not see or read the MAA, and Xerox knew that fact.  See Sexton
Declaration, at 2, ¶7; Morgan Declaration, at 3, ¶12 (a click to
the hyperlink to the MAA is *not* mentioned), ¶¶ 13-15 (only two
clicks to hyperlinks in Exhibit "C," neither of which was to the
MAA).

14

In addition, Xerox put in place a procedure in which it could assure itself that an employee read and understood the MAA, because it asked employees to take a learning module and to "acknowledge" the MAA.  <u>See</u> Exhibit "C."  Xerox tracked the status of this "acknowledgment" and knew that Sexton had not completed the learning module and had not "acknowledged" the MAA.  <u>See</u> Mahmutspahic Declaration, at 2, ¶8.  Xerox also knew that Sexton had not seen or read the MAA.

Because Xerox knew that Sexton had not seen or read the MAA, Xerox knew that Sexton did not know that the MAA supposedly applied to him unless he quit by May 15, 2023.  Despite the fact that Xerox had a plan to follow up on employees who did not read and understand the terms of the MAA, <u>see</u> Exhibit "A," no one followed up with Sexton.

The fact remains that Sexton did not see or read the MAA, and that Sexton did not read and understand the terms of the MAA.  Objectively, it cannot be said that there is evidence of an unambiguous intent on the part of Sexton to be bound by the terms of the MAA.  Because this element of a valid arbitration agreement is not present, Xerox cannot compel compliance to a proposal that required, but did not have, a mutual meeting of the minds.  The Motion should be denied.

B.  Xerox Is Responsible For The Absence Of Objective
    Evidence Of An Unambiguous Intent On The Part Of Sexton
    To Be Bound By The MAA

Perhaps the simplest way for Xerox to have obtained unambiguous assent from its U.S. non-union employees to the MAA, was to present the MAA to such employees, and to have asked for a signature that signified understanding and acceptance of its terms.[6]  Instead of doing that, Xerox embarked on a round-about means of unilateral implementation that involved multiple hyperlinks and multiple-step action.[7]  Even then, Xerox did not follow through on its follow up plans.  Under these circumstances, the absence of objective, unambiguous intent by Sexton to be bound by the terms of the MAA is not surprising.

---

[6]The reason Xerox did not proceed down this path is open to conjecture.  However, one can wonder whether Xerox was concerned that a fair number of employees would not sign the MAA, leaving the company with a choice of a mass firing event or having a significant number of employees outside of any arbitration requirement.  Better for Xerox to eliminate affirmative acceptance and leave employees with the Hobbesian choice of quitting, or doing nothing, purporting to let the company impose its will on them.  But, by dispensing with affirmative acceptance, Xerox also negated unambiguous assent to the terms of the MAA.

[7]An employee had to read Exhibit "C" and then click on the hyperlink to the MAA in order to read it.  Then, the employee had to go to the learning dashboard in GEMS (after learning a new log-on process for GEMS) and complete a learning module; after which, the employee had to acknowledge that they had reviewed the terms of the MAA.  Anticipating that it would not obtain compliance, Xerox told its managers that it would keep track of employees' "acknowledgment" status and provide weekly reports to its managers.  Xerox said that it would notify and prompt managers to follow up with such employees and provided managers with a hyperlink to a "discussion guide."

The facts of this case are very different from the facts of cases where unambiguous intent to be bound by an arbitration agreement has been found.  For example, in <u>Denyer</u>, this Court found the requisite unambiguous intent.

The employee in Denyer signed (1) a notice in which the employee agreed "to be bound by" arbitration procedures for employer-employee disputes; and (2) a "Mutual Agreement to Arbitrate Claims" that covered all disputes arising from employment, termination of employment, and disputes unrelated to employment.  <u>Denyer</u>, at 2-3.  The signature page of the agreement included the following, among other things: "I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT (AND THE POLICY INCORPORATED HEREIN) AND THAT I UNDERSTAND AND AGREE TO BE BOUND BY ITS TERMS."  <u>Id</u>., at 4.

The dispute over arbitration arose in <u>Denyer</u> because the employee claimed that she was unaware of the existence of the arbitration agreement because she had not been provided with a copy of the policy and the first three pages of the arbitration agreement.  <u>Id</u>., at 5.  This assertion was disputed by the employer which submitted a declaration from its labor and employment counsel that stated that it was standard practice to provide full copies of the notice, policy, and agreement to employees, and that the employee's personnel file contained full copies of these documents.

17

The <u>Denyer</u> court ruled against the employee, even assuming that the employee only had what she said she had:

> . . . . not only do the signature pages of both the Notice and the Agreement explicitly reference the arbitration agreement and Policy, they both include language verifying that by signing, Denyer attests that she agrees to the binding arbitration procedures.

<u>Id</u>., at 13.

Unlike this case, <u>Denyer</u> contained facts objectively showing an unambiguous intent to the bound by the terms of an arbitration agreement.  <u>Douglass</u> reached the opposite conclusion.

<u>Douglass</u> involved a handbook that contained an arbitration provision.  The employee in <u>Douglass</u> signed an acknowledgment of receipt of the handbook.  The handbook contained a disclaimer that it was not a contract.  <u>Douglass</u> held that the unambiguous intent to be bound by an arbitration agreement was not present.

In <u>Douglass</u>, the employee had to have been deemed to have read the arbitration provision.  Here, it is undisputed that Sexton never even saw the MAA.  There was no showing of an unambiguous intent to be bound by what was in the handbook in <u>Douglass</u> because of the handbook's disclaimer.  Here, there cannot be unambiguous intent to be bound to something that Sexton never saw, read, or understood.

The <u>Siopes</u> court did not find the requisite unambiguous intent to the bound by an arbitration agreement either.  The

18

employee is <u>Siopes</u> enrolled in the employer's health care plan.
An arbitration agreement was in a separate service agreement
between the health care plan and the employer union health
benefits trust fund. The enrollment document provided that the
employee agreed to the terms and conditions of the health care
plan.  The <u>Siopes</u> court held that the required unambiguous intent
showing was not present:

> Nor did the enrollment form include a statement that a
> separate service agreement exists, or that the enrollee
> has read and understood the service agreement or any
> separate document affecting the enrollee's rights.

<u>See</u> <u>Denyer</u>, at 12.

Here, Xerox wanted employees to acknowledge that the
MAA was read and understood, which would evidence the essential
unambiguous intent.  That was not forthcoming from Sexton, who
neither saw nor read; and therefore could not acknowledge an
understanding of what he never saw or read.  Like the facts of
<u>Douglass</u> and <u>Siopes</u>, there can be no objective showing of an
unambiguous intent by Sexton to be bound by the MAA.  The Motion
should be denied.

19

III. <u>CONCLUSION</u>

      For all of the foregoing reasons, Sexton requests that the Court deny the Motion and allow this action to proceed to the merits.

      DATED:  Honolulu, Hawaii     July 24, 2024.


<u>/s/ Carl H. Osaki</u>
CARL H. OSAKI
Attorney for Plaintiff
GLENN SEXTON