IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| GLENN SEXTON,<br><br>    Plaintiff,<br><br>  vs.<br><br>XEROX CORPORATION,<br><br>    Defendant. | Civil No. 24-00188 MWJS-RT<br><br>ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAYING CASE |

**<u>INTRODUCTION</u>**

Who decides this employment dispute?  That is the question presented here. Plaintiff Glenn Sexton sued his former employer, Defendant Xerox Corporation, claiming that it owed him unpaid compensation.  He asked this Court to decide the merits of his claims.  Xerox moved to compel arbitration, contending that Sexton agreed to have his claims resolved by an arbitrator.  In opposing the motion, Sexton argued that he lacked notice of the arbitration agreement and he never agreed to be bound by its terms.  And he backed that argument up with his own sworn declaration.

The Federal Arbitration Act generally requires courts to enforce valid arbitration agreements.  But if there is a genuine dispute of material fact over the very "making of the arbitration agreement," 9 U.S.C. § 4, then a court "must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the

factual issues have been resolved," *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021).

For reasons spelled out in a prior order, the Court concluded that a genuine dispute of material fact existed as to whether Sexton assented to the arbitration agreement.  *See* ECF No. 28.  And so the Court held Xerox's motion in abeyance and, on March 24, 2025, conducted a bench trial on that factual issue.[1]  ECF No. 57.

The Court has carefully considered the evidence presented at trial, as well as the parties' post-trial briefs, *see* ECF Nos. 62 & 64, and it now issues the below Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52(a).  In light of these findings and conclusions, moreover, the Court GRANTS Xerox's motion to compel arbitration and STAYS this action pending arbitration.

## FINDINGS OF FACT

At trial, Xerox offered fourteen exhibits (D-1 through D-6 and D-9 through D-16), including the video deposition testimony of Jahmin Morgan and Ajdin Mahmutspahic (D-15 and D-16).  ECF No. 59.  Xerox also called witnesses Denise Fleming, who testified in person, and Jeffrey John Harradine, who testified remotely via video teleconference.  Although Sexton initially opposed remote testimony, ECF No. 41, he ultimately consented to both the video depositions and the remote testimony, ECF No.

---

[1]    Sexton initially requested a jury trial on the question of whether he had mutually assented to an arbitration agreement, but later conceded that he was not entitled to a jury because he did not make a timely request for one.  ECF No. 34, at PageID.227.

56.  And while Sexton had also raised objections to some of Xerox's exhibits in advance of trial, ECF No. 52, he withdrew them at trial and the exhibits were admitted without objection.  After Xerox rested, Sexton testified in his own case.

Based on the admitted exhibits and testimony, the Court makes the following Findings of Fact:[2]

A.    **Sexton's Professional Background and Responsibilities**

1.    Sexton began working at Xerox in Hawai'i in July 1980.  ECF No. 65, at PageID.324 (Trial Tr. at 2).  He initially worked as a sales representative and, in 1989, became the President of Xerox's Hawai'i business.  *Id.* at PageID.325, 338 (Trial Tr. at 3, 16).  Sexton held the position of President until he separated from the company in March 2024.  *See id.* at PageID.338 (Trial Tr. at 16).

2.    In 2007, Xerox acquired a company called "MRC," which became a subsidiary of Xerox.  *Id.* at PageID.326, 346 (Trial Tr. at 4, 24).  By approximately 2019, Sexton was working principally under MRC.  *Id.* at PageID.344 (Trial Tr. at 22).  But as President of Xerox in Hawai'i, and until he separated from Xerox in March 2024, Sexton remained on Xerox's payroll and maintained a Xerox email address.  *Id.* at PageID.338, 358 (Trial Tr. at 16, 36).

---

[2]    Given the relatively straightforward facts involved, the Court is filing these Findings of Fact before all trial transcripts have become available.  For that reason, the Court refers to the names of witnesses on whose testimony its findings depend where appropriate, but it does not cite a transcript when describing the testimony, except for that of Sexton, for whom a transcript is available.

3.      As President of Xerox in Hawaiʻi, Sexton was considered a "people manager."  This meant that Sexton was responsible for directly supervising employees of Xerox.  His role as a people manager included the responsibility to monitor these employees' compliance with Xerox's training and other requirements.

4.      Denise Fleming worked as Sexton's executive assistant beginning in 2005 and until the last day of Sexton's employment at Xerox.  The Court finds that her trial testimony was credible, both because of her demeanor and because of the reasonableness of its content and its consistency with other admitted evidence.  Fleming testified that, in her role as Sexton's executive assistant, she was granted access to Sexton's Xerox email account.  Fleming would use this access to scan Sexton's emails and identify matters that required Sexton to take action.  She would often bring important topics to his attention verbally, by putting a copy of the email on his desk, or by marking them electronically with a red flag.  But even though Fleming would typically flag important emails, she also testified that Sexton took the view that his employees were professionals who were ultimately responsible for managing their own email inboxes.  Consistent with this philosophy, she observed that Sexton monitored his own inbox as well.  In her role, Fleming would also track whether the employees under Sexton's direct supervision had fulfilled their training responsibilities.  She would occasionally access Xerox's training platform, "GEMS" (short for Global Employee Management System), using Sexton's credentials to run reports on his supervisees'

compliance with required trainings, and she would follow up with employees that had failed to complete mandatory trainings.  But while Fleming accessed GEMS for this reason, she testified that she would not have purposely used Sexton's login credentials to launch a learning module that he was responsible for completing.

5.      Until the middle of 2023, Sexton had a direct supervisor who was based on the West Coast of the continental United States.  ECF No. 65, at PageID.338-39 (Trial Tr. at 16-17).  That direct supervisor was in the practice of notifying Sexton when his required trainings had not been completed.  *See id.* at PageID.331 (Trial Tr. at 9).  But around the middle of 2023, Sexton's direct supervisor was relocated to the East Coast and took on other work responsibilities, even as he continued acting as Sexton's direct supervisor.  *Id.* at PageID.338-39 (Trial Tr. at 16-17).  Sexton testified at trial that his direct supervisor became "noticeably less engaged" once he had moved to the East Coast.  *Id.* at PageID.339 (Trial Tr. at 17).  Given this testimony, which the Court credits, the Court finds that Sexton understood, at least by the middle of 2023, that he could not rely on his direct supervisor to flag uncompleted trainings for him.

**B.      Xerox's Communication and Training Protocols**

6.      Xerox's Associate General Counsel, Jeffrey John Harradine, testified that Xerox employees are—and at all relevant times have been—expected to read and respond, as appropriate, to their emails.  The Court finds that Harradine's testimony was credible, on this point and more generally, both because of his demeanor and

because of the reasonableness of its content and its consistency with other admitted evidence. Moreover, Harradine's familiarity with Xerox's corporate communication practices stemmed not only from his role as Associate General Counsel (which he has held since June 2024), but also from his prior "people manager" role as Senior Managing Counsel for Xerox's Litigation and Employment group (which was the position he held in 2023).

7.    Harradine testified that one reason why Xerox employees are expected to stay on top of their emails is because Xerox is a global technology corporation that uses email as its standard channel for communication. In the United States alone, Xerox had approximately 9,000 to 10,000 non-union employees, including Sexton, during the relevant 2023 timeframe. Given the sprawling size of the company, messages about training and other important information—including messages concerning updated business codes of ethics and anti-bribery policies—were communicated via email.

8.    Ajdin Mahmutspahic, a senior analyst at Xerox since 2008, testified via video deposition about Xerox's "GEMS" learning platform, which he supports and over which he has an administrative role that allows him to review records. His testimony was credible, both because of his demeanor and because of the reasonableness of its content and its consistency with other admitted evidence. Mahmutspahic testified that Xerox uses GEMS to assign trainings to employees throughout the United States and the world. Employees receive notifications that they have been assigned trainings via

email.  They are then reminded through email about upcoming deadlines for

completing the trainings.  If trainings are overdue, employees continue to receive

weekly email reminders.  Using GEMS data, Mahmutspahic and certain other Xerox

employees can review whether employees have initiated their trainings (in which case

GEMS will report the training as "in progress"), and whether they have completed their

trainings.  Mahmutspahic testified that, on rare occasion, employees would complete

trainings, and GEMS would not register the training as "completed."  He explained that

this problem might happen because of a breakdown in the communication between an

employee's computer and Xerox's server.  But Mahmutspahic stated that he had never

encountered the opposite problem, a situation in which GEMS reported an employee's

training module status as "in progress"—that is, indicating that the employee had at

least started a training—when they in fact had not done so.

9.    Jahmin Morgan, a Xerox employee with twenty years of experience in

communications, handles internal communications for the company's Human

Resources group, and she also testified via video deposition.  Her testimony was

credible, both because of her demeanor and because of the reasonableness of its content

and its consistency with other admitted evidence.  Consistent with Harradine's

testimony, Morgan testified that Xerox is a global organization with approximately

20,000 employees—about 9,000 to 10,000 of which are non-union employees in the

United States as of 2023—and that email communications are therefore a highly

7

important means of communication at the company.  She explained that all Xerox

employees have a Xerox company email address, that Xerox uses email as the primary

communication mechanism, and that fundamental to Xerox's culture is an expectation

that employees will stay on top of their emails.  That expectation, Morgan further

explained, is especially true for senior managers and leaders.  Occasionally, Xerox

might supplement its email communications via its internal employee website, and

through townhalls or GEMS trainings.  But given the importance of email as a primary

mode of communication, Xerox can—through its internal communication platform,

Poppulo—track whether and when any given employee's email account has opened an

email or clicked on hyperlinked text within the message.[3]

### C.    The Mutual Arbitration Agreement

10.    On April 14, 2023, Xerox's Executive Vice President and Chief Human

Resources Officer, Suzan Morno-Wade, sent an email to all "people managers" of U.S.

non-union employees.  *See* ECF No. 52-1, at PageID.268 (Ex. D-1).  The message

---

[3]    In advance of trial, Sexton objected to Poppulo data, apparently on the ground
that the data were generated by Poppulo and Xerox intended to call its own employees
rather than a custodian from Poppulo.  Sexton withdrew that objection at trial, but in
any event, the objection was not well founded.  As the Ninth Circuit has affirmed,
"exhibits can be admitted as business records of an entity, even when that entity was
not the maker of those records, so long as the other requirements of Rule 803(6) are met
and the circumstances indicate the records are trustworthy."  *United States v. Childs*, 5
F.3d 1328, 1333 (9th Cir. 1993).  Those other requirements were met here:  although the
Poppulo data were generated by Poppulo rather than Xerox, Xerox kept the data in the
regular course of its business and relied on the data's accuracy for its own business
purposes.  And no basis for questioning the reliability of the data has been identified.

explained that in the following week, Xerox would "introduce a new Mutual

Arbitration Agreement (MAA) for all non-union employees based in the U.S.," and that

the agreement would "require arbitration rather than litigation when legal disputes

arise with current or former employees."  *Id.*  The email provided a link to the

agreement, a set of answers to frequently asked questions, and a discussion guide to use

with supervisees.  The message also explained that employees "will be asked to

acknowledge they have reviewed the agreement by its effective date of May 15, 2023."

*Id.*

11.     As a "people manager" at the time, Sexton's email account received the

April 14, 2023, message.  Nonetheless, Poppulo records show that Sexton did not open

the email or click on any hyperlinked text within it.  *See* ECF No. 16, at PageID.75 (Ex.

D-2).  And Sexton testified at trial that he was in the continental United States for a

family trip when the April 14, 2023, email was sent.  ECF No. 65, at PageID.333 (Trial Tr.

at 11).  The Court finds Sexton's testimony on this point credible, and it explains why

Sexton overlooked the April 14, 2023, email despite the cultural expectation at Xerox

that employees would carefully monitor their email messages.

12.     That was not, however, the last email message Sexton's email account

received concerning the MAA.  On April 19, 2023, Sexton's email account received an

email message that was sent to all U.S. non-union employees.  *See* ECF No. 52-2, at

PageID.271 (Ex. D-3).  This message, once again signed by Morno-Wade, explained that

9

Xerox was "introducing a new Mutual Arbitration Agreement (MAA) for all non-union employees based in the U.S." *Id.* The message provided links to a general overview about arbitration from the American Arbitration Association, a set of frequently asked questions about the MAA and their answers, a "Mandatory Arbitration Agreement training module" in GEMS, and Xerox's human resources internal communication platform (myHRconnection), so that employees could ask any specific questions about the MAA. *Id.* The email advised its recipients that they were required to "**read and acknowledge the terms of the MAA by May 15, 2023**," and stated that "[t]he agreement requires arbitration of most legal disputes between Xerox and employees after this date." *Id.* (bold in original). The email message did not, however, explicitly state that continuing employment at Xerox past May 15, 2023, would constitute acceptance of the MAA.[4]

13.    By the time of the April 19, 2023, email message, Sexton had returned to Hawai'i from his family trip on the continental United States. ECF No. 65, at

---

[4]    Both the MAA itself (Ex. D-4) and the frequently asked questions document (Ex. D-5), by contrast, explicitly state that employment past May 15, 2023, constitutes acceptance of the MAA. *See* ECF No. 16, at PageID.79 (Ex. D-4, at 1) ("**If Employee does not wish to accept and be bound by the terms of this Agreement, Employee must terminate their employment before the Effective Date of this Agreement, May 15, 2023.** Any attempt to reject any or all terms of this Agreement other than by separation of employment will not preclude application or enforcement of this Agreement for future claims covered by the Agreement." (bold in original)); *id.* at PageID.84 (Ex. D-5, at 1) ("**Is the MAA mandatory?** Yes. If you are still employed by the Company on May 15, 2023, the MAA automatically applies to you. Assent to the terms of the MAA is a condition of your continued employment after that date." (bold in original)).

PageID.362 (Trial Tr. at 40).  And the Court finds that Sexton did receive and review this

message.  The Court makes this finding for five reasons.  First, Poppulo records show

that Sexton's email account opened the April 19, 2023, email eight times on April 20,

2023:  twice at 12:20 a.m., three times at 12:21 a.m., once at 12:41 a.m., and two more

times at 12:58 a.m. (all UTC times).  *See* ECF No. 16, at PageID.94 (Ex. D-9).  Second,

Poppulo records show that both the link to the general overview about arbitration from

the American Arbitration Association, and the link to Xerox's human resources internal

communication platform (myHRconnection) were clicked on through Sexton's email

account.  *Id.*  Third, the Court considers this Poppulo data against the backdrop of

Xerox's cultural expectation that employees—especially "people managers" like

Sexton—would carefully review their email correspondence.  Fourth, while Denise

Fleming did regularly conduct reviews of Sexton's emails, her testimony made it clear

that it would have been highly unlikely that her reviews would have generated this

type of review data (including opening the email eight times within an hour and

clicking on two links within the email).  That is because she specifically testified that she

would review Sexton's email by skimming the messages' titles in his inbox and clicking

to open the message to review its contents—but her review did not involve purposely

taking any further action within any email itself.[5]  Fifth and finally, Sexton himself

---

[5]    Although Fleming acknowledged in her testimony that she could conceivably
have accidentally clicked on a link in Sexton's emails—particularly if she received the

acknowledged in his testimony that he had a general understanding that Xerox was

trying to roll out an arbitration agreement, and he had a "vague recollection" of seeing

the April 19, 2023, email.  ECF No. 65, at PageID.334 (Trial Tr. at 12); *see also id.* at

PageID.352 (Trial Tr. at 30).  For these reasons, the Court finds that Sexton himself

reviewed the April 19, 2023, email, and clicked on the hyperlinks as reflected in the

Poppulo records.

14.    The Court further finds, however, that neither the emails nor the

hyperlinks on which Sexton clicked would have unambiguously explained to him that

continuing his employment past May 15, 2023, would constitute acceptance of the

MAA.  Poppulo records reflect that Sexton *did not* click on the two hyperlinks that

would have provided him with that information:  the link to the frequently asked

questions and their answers, and the link to the MAA itself.  *See supra* note 4.  The

subject line of the email read, "ACTION:  Acknowledge the Mutual Arbitration

Agreement by May 15, 2023," but it did not say that an employee would be bound to

the agreement even if they failed to acknowledge it.  ECF No. 52-2, at PageID.271 (Ex.

D-3, at 1).  And the April 19 email's more general statement that "[t]he *agreement*

_____

same email in her own inbox—the Court finds that that is too unlikely a possibility to
explain the Poppulo records, particularly given the obvious carefulness that Fleming
demonstrated during her testimony, which the Court infers is a reflection on the degree
of care she gives to her work.  Indeed, in his own testimony, Sexton himself praised
Fleming for her high degree of competency.  ECF No. 65, at PageID.347 (Trial Tr. at 25)
(Sexton stating that "Ms. Fleming had -- extremely competent, very trustworthy").

requires arbitration of most legal disputes between Xerox and employees after [May 15, 2023]," did not unambiguously inform Sexton what words or acts would constitute acceptance of that agreement. *Id.* (emphasis added).

15. The Court additionally finds that there is no evidence that Sexton learned of the MAA's mechanism for acceptance—that is, staying on as a Xerox employee past May 15, 2023—through other means at any time before June 5, 2023. Denise Fleming did not recall having any specific conversations with Sexton about the MAA. Nor did Xerox call any other witness or present any other evidence that would support the inference that Sexton learned, either on April 19, 2023, or at any time before June 5, 2023, that continuing his employment at Xerox would constitute acceptance of the MAA.

16. On April 21 and 28, 2023, Sexton's email inbox received reports showing the progress each of his direct supervisees had made in completing assigned trainings. These lists showed that some, but not all, of Sexton's direct supervisees had completed the GEMS training on the MAA. *See* Ex. D-14, at 5-7. Xerox did not offer any evidence that Sexton opened these emails, however, and the Court finds that there is insufficient evidence to conclude that he did. In any event, these reports did not unambiguously inform Sexton that his own continued employment at Xerox past May 15, 2023, would constitute acceptance of the MAA.

17.     On May 8 and 12, 2023, Sexton's inbox received automated emails

notifying him that he had not yet completed the GEMS training on the MAA and that

this training was "due to be completed" by May 15, 2023.  *See* Ex. D-14, at 8-9.  On

May 20 and 27, 2023, and again on June 3, 10, 17, and 24, 2023, Sexton's email inbox

notified him that the GEMS training on the MAA was overdue.  *Id.* at 10-14, 16-18.

None of these emails unambiguously informed Sexton that his own continued

employment at Xerox past May 15, 2023, would constitute acceptance of the MAA.

18.     On June 5, 2023, however, Sexton received an email that is critical to the

Court's ultimate ruling on Xerox's motion.  The subject line of that email was "Mutual

Arbitration Agreement Applicable as of May 15, 2023."  *Id.* at 15.  The message was sent

to U.S. non-union employees who—like Sexton—were assigned but did not complete

the MAA training in GEMS.  Poppulo records show that Sexton opened this email

twice.  *See* ECF No. 16, at PageID.98 (Ex. D-11).  GEMS training records also show that,

as of July 6, 2023, Sexton's GEMS training on the MAA was "In Progress."  *Id.* at

PageID.106 (Ex. D-13).  The first slide of the GEMS training merely provides the title of

the program:  "MUTUAL ARBITRATION AGREEMENT TRAINING," along with a

course code.  *Id.* at PageID.103 (Ex. D-12).  The second slide, however, clearly states, that

"**[y]our continued employment after May 15, 2023 constitutes acceptance of the terms

and conditions of the MAA.**"  *Id.* (bold in original).  The language in this sentence

appears in bold font, and the date of May 15, 2023, is more emphatically highlighted in red font.

19.    Sexton testified that he did not recall seeing the June 5, 2023, email; did not recall initiating the GEMS training on the MAA or reviewing any of its contents; and did not recall learning that his continued employment at Xerox past May 15, 2023, would constitute acceptance of the MAA until after he filed this lawsuit.  ECF No. 65, at PageID.337, 352 (Trial Tr. at 15, 30).  The Court credits Sexton's testimony in that he is honestly testifying about his lack of memory.  But based on the totality of the evidence in the record, the Court finds that Sexton did in fact receive and review the June 5, 2023, email; that he began his GEMS training on the MAA after receiving the email; and that he actually saw the contents of the second slide of that training, which informed him that continuing employment at Xerox past May 15, 2023, would constitute acceptance of the MAA.

20.    The Court reaches the above findings for four reasons.  First, the Poppulo records show that Sexton's email account opened the June 5, 2023, email twice.  ECF No. 16, at PageID.98 (Ex. D-11).  Second, although Denise Fleming reviewed Sexton's emails, she testified in no uncertain terms that she would not have purposely initiated a GEMS training using Sexton's account, and for reasons noted earlier, *see supra* note 5, the Court finds that there is no meaningful likelihood that she did so by accident.  *See also* ECF No. 65, at PageID.350 (Trial Tr. at 28) (Sexton testifying that he "didn't ask [his]

assistant, Ms. Fleming, to complete those trainings for [him]").  This evidence therefore supports the finding that Sexton himself saw the June 5 email and began the GEMS training.  Third, that finding is especially appropriate given Xerox's cultural expectation that employees—including and, especially "people managers"—would stay on top of their emails.  And as Fleming also testified, Sexton expected his supervisees to be responsible for their emails, which supports the conclusion that he would have expected no less of himself.  Moreover, by the middle of 2023, Sexton's direct supervisor had relocated to the East Coast and he became "noticeably less engaged" at that time, such that Sexton would not have expected that supervisor to consistently flag important trainings for him.  *Id.* at PageID.339 (Trial Tr. at 17).  Finally, the Court finds that while GEMS records do not conclusively show what aspects of the GEMS training slides Sexton would have seen, the most appropriate inference is that he at least proceeded to the second slide.  It is highly unlikely that Sexton would have taken the trouble to log into the MAA training on GEMS only to stop at the first slide, which contains nothing other than a title of the program.  And Sexton himself offered no reason why he would have stopped there.  The most natural inference, therefore, is that Sexton proceeded at least to the second slide in the training, and that on that slide he saw, in bold and red font, the warning that his continued employment past May 15, 2023, would constitute acceptance of the MAA.

16

21.    Having received this actual notice, Sexton chose to continue in his employment at Xerox until separating from the company in March 2024.

22.    Sexton testified that by 2023, he principally performed work at Xerox's subsidiary, MRC.  *Id.* at PageID.345 (Trial Tr. at 23).  He also testified that many trainings and protocols emailed from Xerox were incompatible with MRC's trainings and protocols, and he therefore often disregarded Xerox's communications during this time.  *See, e.g., id.* at PageID.343-45 (Trial Tr. at 21-23).  The Court credits these aspects of Sexton's testimony—which Xerox did not offer any evidence to contradict—but finds that they do not weigh against the Court's finding that Sexton received actual notice, by around June 2023, that his continued employment at Xerox would constitute acceptance of the MAA.  Even if Sexton might have had reasons to believe it was appropriate for him to disregard Xerox's messages more generally, the evidence persuades the Court, for the reasons explained above, that Sexton in fact did not disregard the June 5, 2023, email about the MAA and the associated training.

23.    The rollout of the MAA was highly effective.  Of the approximately 9,000 to 10,000 U.S. non-union employees who were assigned the GEMS training on the MAA, only about 200 of them had failed to complete the training as of July 2023.  Put differently, nearly 98 percent of Xerox's assigned employees received the email messages and diligently responded by completing the training that had been assigned

to them.  This fact further supports the inference that, as Xerox's witnesses testified, the

cultural expectation at Xerox was that employees carefully monitored their emails.[6]

## CONCLUSIONS OF LAW

1.        Hawaiʻi state law governs the question of whether a valid arbitration

agreement exists between Sexton and Xerox.  *See Keebaugh v. Warner Bros. Ent. Inc.*, 100

F.4th 1005, 1013 (9th Cir. 2024) ("In determining whether the parties have agreed to

arbitrate a particular dispute, federal courts apply state-law principles of contract

formation." (citation omitted)); ECF No. 16, at PageID.59 (Xerox recognizing that "[t]he

question of whether there is a valid agreement to arbitrate a particular dispute is a

matter of state contract law"); ECF No. 20, at PageID.129 (Sexton accepting that "[t]he

---

[6]        At trial, Sexton's counsel argued that this high rate of compliance was, in fact,
evidence that Xerox *did not* clearly communicate with its employees.  To that end,
counsel pointed to the fact that the April 19, 2023, email did not clearly indicate that
continued employment at Xerox past May 15, 2023, would constitute acceptance, and
that the GEMS training module did not require employees to "accept" the MAA—
instead, the training merely asked employees to "acknowledge[]" it.  ECF No. 16, at
PageID.104 (Ex. D-12).  This argument is not persuasive.  Although the April 19, 2023,
email itself did not unambiguously notify employees that their continued employment
at Xerox would constitute acceptance, and although the GEMS training module did not
provide an "accept" option, the GEMS training did unambiguously—in bold and red
font in the second slide of the training—inform employees that continued employment
at Xerox past May 15, 2023, would constitute acceptance of the MAA.  *See id.*  And only
200 employees—of the approximately 9,000 or 10,000 covered—failed to successfully
complete that training.  The most appropriate inference from these facts is that Xerox
did provide adequate notice to U.S. non-union employees that continued employment
past May 15, 2023, would constitute acceptance of the MAA, and that those employees
chose to stay on as Xerox employees anyway because they accepted the MAA.

determination of whether a valid agreement to arbitrate exists is dependent on ordinary

state law principles of contract formation").

2.      Under Hawaiʻi state law, a valid contract generally requires an offer,

acceptance, and consideration.  *See, e.g., Douglass v. Pflueger Haw., Inc.*, 110 Hawaiʻi 520,

525, 135 P.3d 129, 134 (2006).  There undisputedly was an offer here:  Xerox offered its

at-will employees, like Sexton, continued employment past May 15, 2023.  There

likewise is no dispute that consideration was contemplated:  continued employment

was offered in exchange for employees' acceptance of the MAA, and Xerox also agreed

to be bound by the MAA's terms.  The only disputed issue is whether Sexton accepted

the arbitration agreement—that is, whether there was mutual assent between him and

Xerox to arbitrate.  *See id.* at 532, 135 P.3d at 141.

### A.      Legal Standards for Mutual Assent

3.      Determining whether there was mutual assent between Sexton and Xerox

does not call for an inquiry into Sexton's subjective intentions or beliefs; the issue,

instead, is whether his "words or acts . . . judged under a standard of

reasonableness . . . manifested an objective intention to agree."  *Pac. Com. Servs., LLC v.

LVI Envʼt Servs., Inc.*, Civ. No. 16-00245, 2017 WL 2817883, at *4 (D. Haw. June 26, 2017)

(cleaned up).

4.      At the close of trial, Sexton repeated his argument—made in earlier

briefing—that mutual assent must be unambiguous.  As the Court explained in its prior

order, however, the Hawaiʻi Supreme Court appears to require only that the language of the *agreement* unambiguously submit a dispute to arbitration. *See* ECF No. 28, at PageID.212-13; *see also Siopes v. Kaiser Found. Health Plan, Inc.*, 130 Hawaiʻi 437, 450, 312 P.3d 869, 882 (2013) (explaining that "in order to be valid and enforceable, an *arbitration agreement* must be unambiguous as to the intent of the parties to submit disputes or controversies to arbitration" (emphasis added)). That is not the same as saying that a person must unambiguously assent to the agreement. And when *Siopes* spoke of "look[ing] beyond the language of the arbitration provision to the surrounding circumstances," it did not say that those surrounding circumstances must *unambiguously* prove mutual assent. 130 Hawaiʻi at 451, 312 P.3d at 883; *see* ECF No. 64, at PageID.312 n.1 (Xerox contending that Sexton "conflated the mutual assent requirement with unambiguous intent to submit to arbitration," and that "there is <u>no</u> requirement in Hawaii that the assent be unambiguous" (underline in original)).

5. Nonetheless, the Court acknowledges that the Ninth Circuit—in generally describing California law—has spoken of the need to show "an unambiguous manifestation of assent," *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514 (9th Cir. 2023), which is a formulation arguably consistent with Sexton's position. The Court need not resolve whether California law departs from Hawaiʻi law on this issue, because it finds—for reasons detailed below—that Xerox has met even the heightened burden of showing an unambiguous manifestation of assent.

20

6.      "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence."  1 *Williston on Contracts* § 4:16 (4th ed. May 2024 Update) (footnote omitted).  If an offeree like Sexton has no notice of an offer, their subsequent words or actions cannot be objectively understood as manifesting an intention to agree.  Simply put, a person cannot reasonably be objectively viewed as having accepted an offer if they received no notice of it.

7.      The key question here, then, is more precisely whether Sexton received adequate notice of Xerox's offer of continued employment past May 15, 2023, in exchange for acceptance of the MAA.  If Sexton did receive adequate notice of this offer, then his subsequent conduct—of continuing his employment at Xerox until 2024— would, under a standard of reasonableness, properly be viewed as manifesting an unambiguous intention to agree.

8.      The parties disagree about what kind of notice is adequate under Hawaiʻi law.  Sexton argues that he must have received actual notice—meaning that he *actually* (that is, subjectively) learned that continued employment past May 15, 2023, was conditioned on accepting the MAA.  Xerox counters that it is sufficient that it provided Sexton with "all the tools and notice he needed—it was simply incumbent upon him to read what he was repeatedly provided to understand this new requirement of his employment."  ECF No. 21, at PageID.167 (emphasis omitted).  Relatedly, Xerox argued at trial that Sexton need not have received *any* notice—whether actual or inquiry

notice—that continued employment past May 15, 2023, would be treated as acceptance of the MAA, and that it need only show that Sexton received more general notice that the MAA was being rolled out and would be effective as of May 15, 2023.

9.      In the Court's view, the parties' positions are off the mark in opposing directions.

10.     Sexton's argument that he must have subjectively known of Xerox's offer is incorrect.  Mutual assent is judged under an objective standard, and "the purely subjective, or secret, intent of a party in assenting is irrelevant in an inquiry into the contractual intent of the parties."  *Standard Mgmt., Inc. v. Kekona*, 99 Hawai'i 125, 134, 53 P.3d 264, 273 (App. 2001).  To determine whether a party has assented to a contract, then, a factfinder need not determine what a party subjectively knew or understood. The only question is whether that party's words or acts, viewed objectively under a standard of reasonableness, manifests an objective intention to agree.  For example, when parties receive and sign a contract, they ordinarily will be deemed to have assented to the contract even if it turns out that they did not carefully read the document or did not fully appreciate that they were binding themselves to a contract. *See Siopes*, 130 Hawai'i at 448, 312 P.3d at 880 ("The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." (cleaned up)).

11.    So, too, when parties are adequately advised that accepting certain offered benefits (such as, for example, accepting the benefit of continued employment) will constitute acceptance of a contract, and they choose to accept those benefits, they will be deemed to have accepted the contract even if they did not subjectively understand that they were binding themselves to one. *See Credit Assocs. of Maui, Ltd. v. Carlbom*, 98 Hawai'i 462, 468, 50 P.3d 431, 437 (App. 2002) (explaining that "parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other" (cleaned up)).

12.    Because mutual assent hinges on an objective inquiry into the ordinary meaning of a person's behavior, rather than a subjective inquiry into a person's actual knowledge or thoughts, Sexton cannot avoid being bound by the MAA simply by contending he did not subjectively become aware of the terms of Xerox's offer, despite having received unambiguous notice of what would constitute acceptance.  In *Oberstein*, for example, the Ninth Circuit affirmed the district court's grant of a motion to compel arbitration—without holding a trial—where screenshots of a website demonstrated that the purchaser of a ticket received conspicuous notice that continuing to use the website would constitute acceptance of an arbitration agreement, and the purchaser thereafter continued to use the website; the Ninth Circuit concluded that doing so "unambiguously manifested assent."  60 F.4th at 517.  By reaching these conclusions,

23

the Ninth Circuit made clear that purchasers could not defeat this objective showing of mutual assent by suggesting that they subjectively missed the message—that they either did not notice it, did not understand it, or did not recall seeing it. *See id.* at 518.

13.    But Xerox's argument appears to go too far in the other direction. It is not enough that Sexton had some general awareness that Xerox was seeking to impose an arbitration agreement on its employees. Nor is it enough that Xerox provided Sexton with the "tools" he needed to discover that his continued employment past May 15, 2023, would constitute acceptance of the MAA. Xerox must also show that given the form and manner of notice it provided to Sexton—and given all the relevant surrounding circumstances—Sexton's "words or acts . . . judged under a standard of reasonableness," are properly understood as unambiguously manifesting "an objective intention to agree" to Xerox's offer. *Pac. Com. Servs.*, 2017 WL 2817883, at *4 (cleaned up); *see also Siopes*, 130 Hawaiʻi at 451, 312 P.3d at 883 (requiring an examination of the "surrounding circumstances" to determine whether there was mutual assent). And to meet its burden of showing that Sexton's continued employment *should* be viewed as manifesting an objective intention to agree to the MAA, Xerox must first show that Sexton had notice that his continued employment *would* be viewed that way. It is not enough for Xerox merely to show that Sexton had the *ability* to get that notice, or that he generally knew an agreement was in the works.

24

14.    That leaves the question of what constitutes adequate notice.  The Court

has already explained that actual notice—notice that resulted in Sexton's subjective

knowledge—is not required.  It follows that inquiry notice is sufficient.  That is, it is

legally sufficient for Xerox to show that (a) it took reasonable measures to provide

Sexton clear and conspicuous notice and (b) Sexton plainly would have received that

notice had he been reasonably prudent under the circumstances.[7]  The Ninth Circuit's

decision in *Oberstein* takes the view that inquiry notice of that sort is sufficient under

California law.  60 F.4th at 515.  And in its supplemental brief, Xerox cites other cases in

which California law has been construed that way.  *See* ECF No. 64, at PageID.317-19.

### B.    Inquiry Notice

15.    The parties acknowledge that Hawai'i courts have not squarely resolved

whether inquiry notice is similarly sufficient under Hawai'i state law, and so the Court

must predict how the Hawai'i Supreme Court would resolve the question.[8]  But given

---

[7]    This is a higher burden than the one for which Xerox appears at times to advocate, because inquiry notice requires more than merely showing that a person was provided the tools to obtain the needed notice.  There must also be a showing that a reasonably prudent person, using whatever tools were provided, clearly *would* have gotten the notice.

[8]    When a matter of state law is unresolved, this Court has discretion to certify legal questions to the Hawai'i Supreme Court when such an issue is "determinative of the cause" and "there is no clear controlling precedent in the Hawaii judicial decisions." *Richardson v. City & Cnty. of Honolulu*, 802 F. Supp. 326, 345 (D. Haw. 1992).  But the Court "should not certify questions when the answer is reasonably clear and the court can, using its best judgment, predict how the Hawai'i Supreme Court would decide the

that Hawaiʻi law applies an objective standard to determine whether mutual assent

exists, the Court concludes that the Hawaiʻi Supreme Court would treat inquiry notice

of how to express mutual assent as sufficient.  Put another way, the Court predicts that

the Hawaiʻi Supreme Court would conclude that if (1) an employer has provided clear

and conspicuous notice that continued employment would constitute acceptance of a

contract and (2) a reasonably prudent recipient of that notice clearly would have

actually learned of it—with proper attention given to all surrounding circumstances,

including the cultural expectations of the particular workplace at issue—then an

employee's decision to continue their employment is properly viewed, under an

objective standard, as manifesting an objective intention to agree.

16.    Based on the evidence presented at trial, the Court concludes that Xerox

provided sufficient inquiry notice to Sexton that his continued employment past

May 15, 2023, would constitute acceptance of the MAA.  The evidence amply

demonstrates the cultural expectation at Xerox that employees would carefully monitor

their email correspondence.  And given Sexton's position as a "people manager," he

should have been especially attuned to that responsibility.  Against this backdrop,

Sexton received multiple email messages about the rollout of the MAA.  Those emails

---

issue." *Roe v. Ram*, Civ. No. 14-00027, 2014 WL 4276647, at *8 (D. Haw. Aug. 29, 2014).
Here, the Court exercises its discretion not to certify a question because neither party
asked the Court to do so, and because the Court determines that the answer to the issue
of notice is reasonably clear, particularly given the circumstances of this case.

provided links to the MAA itself, along with answers to frequently asked questions, both of which provided notice, in unambiguous terms, that continued employment past May 15, 2023, would constitute acceptance of the MAA.  He was assigned a training protocol on GEMS that similarly provided unambiguous notice about the consequences of continued employment past May 15, 2023.  And he received numerous follow-up emails to advise him that he had not yet completed that training.  These facts amply prove that Sexton received inquiry notice that his continued employment at Xerox past May 15, 2023, would constitute acceptance of the MAA.

17.    Although Sexton contends that he paid less attention to Xerox emails because of his role at MRC and the sometimes-inconsistent messaging and policies between Xerox and MRC, the Court finds that a reasonably prudent employee in Sexton's position would not have disregarded Xerox's multiple communications about the MAA.  And while Sexton also contends that his direct supervisor did not bring the MAA training to his attention, the Court finds that a reasonably prudent employee in Sexton's position would have understood that monitoring emails and completing trainings were their own responsibilities, and that they were not relieved from those responsibilities merely because a direct supervisor had not yet called them out for failing to complete those trainings.

//

//

### C.    Actual Notice

18.    In any event, although the Court has found that inquiry notice is sufficient

as a matter of law, it has also found that Xerox proved actual notice as a matter of fact.

That is to say, the Court has found that Sexton actually received and reviewed the

June 5, 2023, email, logged into his GEMS training account, and saw at least the second

slide of that training module—which explicitly (in bold and red font) informed him that

continuing as an employee at Xerox past May 15, 2023, would constitute acceptance of

the MAA.  *See supra* pp. 15-17 (Findings of Fact ¶¶ 18-20).  Although the Court credits

Sexton's testimony that he does not recall having learned these things, the Court

concludes that the evidence proves he did in fact learn them at one point.

19.    Resisting this conclusion, Sexton argues that it is immaterial whether he

received actual notice in June 2023 because the MAA's effective date of May 15, 2023,

had passed by that point.  *See* ECF No. 62, at PageID.305-06.  This argument is not

persuasive.  To be sure, if actual notice were required—despite the Court's earlier

conclusion that it is not—then Sexton would not have been bound to the contract

between May 15, 2023, and June 2023, because he would not yet have received the

requisite notice that continuing as an employee would constitute acceptance.  But Xerox

conditioned continued employment at any time after May 15, 2023, as acceptance.  So

once Sexton did receive actual notice—which the Court has found that he did by June

2023—continuing employment past the date of that notice would, at that point,

constitute acceptance of the MAA.  That is because continuing employment past June 2023 would, necessarily, amount to continuing employment after May 15, 2023.  By the time Sexton separated from Xerox in March 2024, therefore, he had unambiguously manifested an objective intention to agree to the MAA.

20.     Finally, it does not matter that Sexton did not sign the MAA—once he had actual notice that continued employment at Xerox was conditioned on acceptance of the MAA, his decision to continue his employment sufficed to establish assent.  *See Carlbom*, 98 Hawaiʻi at 468, 50 P.3d at 437.

## CONCLUSION

In light of the foregoing Findings of Fact and Conclusions of Law, the Court GRANTS Xerox's motion to compel arbitration.  This action is STAYED pending arbitration.  The parties shall provide joint status reports at six-month intervals, beginning with six months from the date of this Order, informing the Court of the status of the arbitration proceeding.  The Clerk of the Court is DIRECTED to administratively close this case pending arbitration.

//

//

//

//

//

IT IS SO ORDERED.

DATED:  April 10, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 24-00188 MWJS-RT; *Glenn Sexton v. Xerox Corporation*; ORDER GRANTING
DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAYING CASE

30