1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAI'I

3
     GLENN SEXTON,                    ) CV 24-00188 MWJS-RT
4                                     )
            Plaintiff,                ) Honolulu, Hawai'i
5                                     ) March 24, 2025
            vs.                       )
6                                     ) NON-JURY TRIAL
     XEROX CORPORATION,               ) Testimony of DENISE FLEMING;
7                                     ) Testimony of JEFFREY
            Defendant.                ) HARRADINE
8    _____ )

9
                 PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10           BEFORE THE HONORABLE MICAH W.J. SMITH
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:        CARL H. OSAKI, ESQ.
13                             Town Tower, No. 17G
                               225 Queen Street
14                             Honolulu, Hawai'i 96813

15   For the Defendant:        RACHEL E. LINZY, ESQ.
16                             The Kullman Firm
                               1100 Poydras Street, Suite 1600
                               New Orleans, Louisiana 70163
17                             *Pro Hac Vice*

18                             CHARLES A. PRICE, ESQ.
                               Koshiba Price & Gruebner
19                             707 Richards Street, Suite 610
                               Honolulu, Hawai'i 96813
20

21   Official Court Reporter:  Debra Read, RDR
                               United States District Court
22                             300 Ala Moana Boulevard
                               Honolulu, Hawai'i 96850
23                             readit3949@gmail.com

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

1                          I N D E X

2                CHRONOLOGICAL INDEX OF WITNESSES

3     DEFENDANT'S WITNESSES                              PAGE

4
      **DENISE FLEMING**
5      Direct Examination By Ms. Linzy                    3
       Cross-Examination By Mr. Osaki                     16
6      Direct Examination By Ms. Linzy                    28

7     **JEFFREY JOHN HARRADINE**
       Direct Examination By Ms. Linzy                    29
8      Cross-Examination By Mr. Osaki                     67

9

10                         I N D E X

11                       E X H I B I T S

12
                                                      FOR
13                                                 EVIDENCE
      NO.                                             PG.
14     _____

15     D-1                                              43
       D-2                                              78
16     D-3                                              46
       D-4                                              31
17     D-5                                              49
       D-6                                              58
18     D-9                                              59
      D-10                                              57
19     D-11                                             60
       D-12                                             51
20     D-13                                             55
       D-14                                              9
21

22

23

24

25

```
 1   MONDAY, MARCH 24, 2025                              9:55 A.M.

 2                            * * * * *

 3                 (Start of partial transcript:)

 4        DENISE FLEMING, DEFENDANT'S WITNESS, WAS SWORN

 5             THE COURTROOM MANAGER:  Thank you.  Please be

 6   seated.

 7        Please state your name for the record, spelling your

 8   first and last name.  Speak into the microphone.

 9             THE WITNESS:  My name is Denise Fleming,

10   D-e-n-i-s-e, last name is Fleming, F-l-e-m-i-n-g.

11             MS. LINZY:  Your Honor, is it all right if I

12   approach to the lectern?

13             THE COURT:  Yes.

14                      DIRECT EXAMINATION

15   BY MS. LINZY:

16        Q    Good morning, Ms. Fleming.

17        A    Good morning.

18        Q    Are you currently employed by Xerox?

19        A    Yes, I am.

20        Q    What is your position with Xerox?

21        A    Executive assistant.

22        Q    What position did you hold in April to July of 2023?

23        A    Same position, executive assistant.

24        Q    And which executives did you assist in 2023?

25        A    I directly assisted our vice president in that time;
```

UNITED STATES DISTRICT COURT

 1    it was Glenn Sexton.  I also provide support to the rest of our

 2    management staff.

 3        Q    And how long did you serve as Mr. Sexton's

 4    assistant?

 5        A    I began my employment March 14th, 2005, and I

 6    supported Glenn until the last day of his employment.

 7        Q    As Mr. Sexton's assistant for over 20 years, would

 8    you say you were familiar with his email practices?

 9        A    Yes, for the most part.

10        Q    By 2023, did Mr. Sexton manage his own email inbox

11    to a certain degree?

12        A    For the most part, yes.

13        Q    To your knowledge, did Mr. Sexton ever type and send

14    his own emails?

15        A    Yes.

16        Q    Did you ever receive emails from Mr. Sexton?

17        A    Yes.

18        Q    From that, did you understand that he was capable of

19    accessing and reviewing emails within his own email box?

20        A    Yes.

21        Q    All right.  Did you have access to his email inbox?

22        A    Yes, I did.

23        Q    And how did that work?  Did you go to his computer

24    and access it there, or could you access it from your own

25    computer?

UNITED STATES DISTRICT COURT

1      A      No.  Xerox IT support allows and sets up in an

2  assistant's Outlook you have access into your manager's Outlook

3  inbox.

4      Q      What was your general responsibility with respect to

5  accessing or viewing Mr. Sexton's email inbox?

6      A      Those responsibilities varied through the years.

7  More recently it was to scan through and look for action items

8  that needed to be addressed, many of which I would take care of

9  or bring to Glenn's attention.

10     Q      Would you flag -- when you say bring to Mr. Sexton's

11  attention, how would you do that?

12     A      I could do so by putting a red flag in the Outlook,

13  I would speak with him directly, and sometimes I would print

14  and leave a copy of it on his desk.

15     Q      If you reviewed an item in Mr. Sexton's inbox

16  through your proxy access, and when you opened it it appeared

17  to be unread so that it was no longer, say, in bold, would you

18  ever change it to be back in bold or unread --

19     A      Yes.

20     Q      -- so that it would appear unread to Mr. Sexton?

21     A      Generally I would move it back to an unread status

22  so that he would know that he had not gone through it.

23     Q      Would you ever delete any of the emails from

24  Mr. Sexton's inbox?

25     A      No, with the rare exception of junk mail.

UNITED STATES DISTRICT COURT

    1        Q        Understood.  As Mr. Sexton's executive assistant for
    2   20-some odd years, were you familiar with his typical practices
    3   concerning Xerox's only learning tool called GEMS?
    4        A        For the most part.
    5        Q        And did you have access to his GEMS learning
    6   dashboard?
    7        A        Yes.
    8        Q        Did you ever take a training course or complete a
    9   training module on his behalf?
   10        A        Absolutely not.
   11        Q        And did Mr. Sexton ever ask you to do so?
   12        A        Absolutely not.
   13        Q        What was your general responsibility with respect to
   14   Mr. Sexton's learning dashboard within GEMS?
   15        A        I would access that merely to see the status of
   16   completions by his direct reports, the rest of the staff.
   17        Q        Would you ever review his completions or the status
   18   of his training requirements?
   19        A        That would be in those reports.
   20        Q        And did you do -- when you were looking at
   21   Mr. -- the reports regarding Mr. Sexton's direct employees and
   22   their status of training, would you be doing that from GEMS or
   23   from emails that were sent to Mr. Sexton's inbox?
   24        A        Combination.  There were some reports that we would
   25   get via email, but not for all training routine things.  Like

1    our annual security trainings we often had to log in and take a

2    look to see the status, who had completed them or not.

3        Q    And when you were looking at the reports of the

4    status of his direct reports, reviewing their training courses,

5    what did you do with that information, if anything?

6        A    I would summarize and send out email reminders to

7    the staff, copying all of their management.

8        Q    Do you recall back in 2023 receiving a notice to

9    your email inbox about Xerox implementing an arbitration

10   agreement for employment disputes?

11       A    Vaguely.

12       Q    Do you recall completing a training module in GEMS

13   to acknowledge that arbitration agreement?

14       A    Vaguely.  I do recall I acknowledged it.

15       Q    Do you recall if you had any discussions with

16   Mr. Sexton about Xerox rolling out this arbitration agreement

17   for employment disputes?

18       A    Nothing specific, no.

19       Q    Do you know if Mr. Sexton attended any manager

20   briefing or training sessions on the arbitration agreement?

21       A    I do not.

22       Q    So if Mr. Sexton had some knowledge or understanding

23   that Xerox was implementing an arbitration agreement, do you

24   know of any way he would have learned of that other than

25   through email communications or the GEMS training module?

 1        A     It's something that could have been discussed on a

 2    management call.  I am not privy to those, so I'm not for

 3    certain.  It would be purely speculative.

 4        Q     After Mr. Sexton's employment ended, did you do

 5    anything to preserve his email inbox?

 6        A     Yes.  I moved copies of all of the PST files so that

 7    they would remain intact.

 8        Q     Have you had reason to look through his inbox or

 9    emails since you preserved them?

10        A     Yes, per the request of Xerox Corporation.

11        Q     Were you asked to search his emails for any

12    communications about the Mutual Arbitration Agreement or the

13    GEMS training module on the Mutual Arbitration Agreement?

14        A     Yes, I believe you asked me to look for those.

15        Q     Right.

16          We have placed, Your Honor, a exhibit binder for the

17    witness to utilize.

18          Do you see it there, Ms. Fleming?

19        A     Yes.  Sorry, I'm reaching for my glasses.  I'm at

20    that particular age.

21        Q     Oh, mine are permanent.

22        A     You talking about the white binder here?

23        Q     Yes.  Thank you.  There are tabs in the binder.  If

24    you could turn to what's behind tab 14.  If you could briefly

25    flip through that exhibit, there should be 18 pages in there.

1              My question to you is do you recognize those emails as

2    the copies of the ones you found on Mr. Sexton's inbox

3    concerning the arbitration agreement?

4         A      Very likely, yes, these would be -- I'll be -- quite

5    honestly, when I was asked to search for various things, I

6    simply moved them into a folder to share with our corporate

7    counsel as I was instructed or asked to do.  I didn't bother to

8    review the documents individually myself.

9         Q      But when you did the action, it was within the inbox

10   that you preserved --

11        A      Yes.

12        Q      -- for Mr. Sexton?

13        A      It was the within the PST files that we had saved.

14              MS. LINZY:  Your Honor, Xerox requests that Exhibit

15   D-14 be entered into evidence.

16              THE COURT:  Any objection?

17              MR. OSAKI:  No objections, Your Honor.

18              THE COURT:  Exhibit 14 is admitted.

19              (Exhibit D-14 received into evidence.)

20        Q      (BY MS. LINZY:)  I want to ask you about -- I think

21   it's probably easier to do so by looking at the specific

22   emails -- how you would address Mr. Sexton's inbox and what you

23   would do within that inbox by looking at some of the emails

24   that were there.

25              If you could take a look at the first page which is an

UNITED STATES DISTRICT COURT

1    email to Mr. Sexton from Suzan Morno-Wade, who is the Chief

2    Human Resources Officer of Xerox, with the subject line Manager

3    Advance Upcoming Mutual Arbitration Agreement Launch.

4        In your typical scan of Mr. Sexton's inbox, would this be

5    an email that you would look into further and feel the need to

6    flag for Mr. Sexton's attention or action?

7        A    Not necessarily.  It's not an action required.

8    There's no deadline attached to it I see looking at it.

9        Understand that we scan through over a hundred emails,

10    his box and mine, each -- every day, so it's a cursory

11    scan-through.

12        Q    And let me ask you this, Ms. Fleming.  In your

13    cursory scan, are you looking at an inbox that shows the

14    sender, the subject line, and the date?  Is that -- that's how

15    mine looks --

16        A    That is correct.  When you click on a particular

17    thing, we also have a preview pane so you can scan the first

18    portion of the email, but that's -- yeah, basically you're

19    rolling down a list of the emails in the box.

20        Q    Thank you.

21        If you could take a look at this email on April 2023, do

22    you recall if you saw this email in Mr. Sexton's inbox?  And I

23    realize I'm asking you to reach back.

24        A    I don't specifically recall this one, no.  I -- I've

25    touched and glanced at so many emails, it's not something that

1  returns to my mind.

2       Q     Understood.  If you could turn to the second page in

3  the exhibit, D-14, this is an email from the Chief Human

4  Resources Officer to Mr. Sexton with the subject line Action:

5  Acknowledge the Mutual Arbitration Agreement by May 15th, 2023,

6  and the email is dated April 19th, 2023.  This is similar to

7  the one that you might have received in your inbox.

8        In your typical scan of Mr. Sexton's emails, would this

9  be an email that you would look into further or feel the need

10  to flag for Mr. Sexton's attention or action?

11      A     Not necessarily, especially if I'd already -- if I'd

12  gotten it, it went out to all employees, I would have reviewed

13  that as something just routine.

14      Q     And do you recall specifically if you saw this

15  particular email in Mr. Sexton's inbox in April of 2023?

16      A     No, I don't.

17      Q     All right.  Would you have had reason to open or

18  review this email eight times in Mr. Sexton's inbox?

19      A     Unknown.  As you and I have gone through the process

20  of the way our Outlook at Xerox works, when I click onto his

21  box, and I have the same situation with my current vice

22  president, when I move into my manager's box, wherever my

23  cursor is, the first email on that list is what comes up as to

24  read.

25       Now, I may or not -- may or may not actually double click

UNITED STATES DISTRICT COURT

 1    and read it on a full screen.

 2        It's also possible to go back and forth between my own

 3    and my manager's, especially if we both have the same email,

 4    and to not always realize or remember which box I'm clicked on.

 5        I will give you an example.  I was asked to print out

 6    some calendar items many years ago, and Glenn brought it back

 7    to me and started chuckling because I had printed from my own

 8    calendar instead of his and he saw that I had my bird's

 9    birthday.

10        Q    Happy birthday to your bird.

11        A    Yes.  Unfortunately she has since passed away,

12    but --

13        Q    Sorry.

14        A    Yes.  Sometimes you click back and forth between the

15    two boxes and you're multitasking everything, so you're not

16    certain without a real focus which one you did.  So it's

17    absolutely possible that I might have clicked on the links in

18    his instead of mine.  I don't know.  It's plausible.

19        Q    Looking at the email, would you have reason in your

20    typical practice to click on any of the links within this email

21    to Mr. Sexton?

22        A    Not with the intent of clicking his.  So again, it

23    is possible that I had his email on my screen rather than my

24    own because we had identical emails, as you're telling me.  I

25    have not actually scanned through to find my copies.  But if we

 1    both had the same email, I would have been opening on my own as

 2    well.

 3        Q    I'm going to ask you to turn in Exhibit D-14 to

 4    page 8.  I believe I've put numbers at the top --

 5        A    Yes.

 6        Q    -- there?

 7         This should take you, if I've gone to the right one, to

 8    an email reminder to Mr. Sexton with the subject line Upcoming

 9    Due Date For MAA 23, Mandatory Arbitration Agreement Training,

10    dated May 8th, 2023.

11        A    Mm-hmm.

12        Q    This appears to be an email reminding Mr. Sexton to

13    complete this training module within GEMS.

14         In your typical scan of Mr. -- Xerox's -- I'm sorry --

15    Mr. Sexton's inbox, would this be an email that you would look

16    into further or feel the need to flag for Mr. Sexton's

17    attention or action?

18        A    I would probably perceive this as something routine

19    and I may have in passing, "By the way, Glenn, you've got

20    another reminder about that arbitration stuff," and that would

21    have probably been the extent of conversation.

22        Q    Do you have any specific recollection of having done

23    so?

24        A    No, I do not.

25        Q    All right.  Would you delete it or move the email

1    when you were reviewing it?

2         A    No.  After a period of time all of the emails would

3    be moved into a file folder.  So it was not always in the

4    inbox, but that would be generally a week or two past the date

5    of the email, then it would be moved aside.

6         Q    All right.  And who did that move?

7         A    I did.

8         Q    All right.  And if you turn to page 9, the next

9    page, this is an additional reminder.  This one it's the

10   required learning is due in three days.  The subject line is

11   Upcoming Due Date For MAA 23 Mandatory Arbitration Agreement

12   Training, and the email is dated May 12th, 2023.

13        If the second reminder comes and indicates that it has

14   not been completed, would you move this email to a folder?

15        A    I would not have moved it until at least a week past

16   the date of the email.

17        Q    Okay.

18        A    Again, I may have said in passing, "Glenn, you got

19   another one of those reminders."  That would have been about

20   the extent of it.

21        Q    All right.  Okay.  I want to take you back a couple

22   pages to page 5 in Exhibit D-14.  This is an email to

23   Mr. Sexton dated April 21st, 2023, with the subject line

24   Learning Summary Report.

25        There are some redactions there for names, but otherwise

UNITED STATES DISTRICT COURT

1    this is how the email presented.  In your typical scan -- I'm

2    going to ask the same question again.  In your typical scan of

3    Mr. Sexton's inbox, would this be an email that you would look

4    into further or feel the need to flag for Mr. Sexton's

5    attention or action?

6         A    An email of this nature I would have taken action on

7    my own and sent an email out to the individuals who are named

8    that had not yet completed and sent them most likely a reminder

9    saying, We see that you have not yet completed this.  Please

10   take care of it as soon as possible.

11        Q    And how did you know to do that?

12        A    I was the unofficial watchdog for the office and I

13   would try to just make sure that everyone was in compliance.

14        Q    And after reviewing this report and following up

15   with the direct reports who needed to complete training, what

16   would you do with the email within Mr. Sexton's inbox?

17        A    It would remain in his inbox.  He would have been

18   copied on any communication that I would have sent out as well.

19        Q    I'm going to ask you to turn to page 15 of Exhibit

20   D-14.  This is an email from Xerox HR Communications to

21   Mr. Sexton dated June 5th, 2023, with the subject line Mutual

22   Arbitration Agreement Applicable as of May 15th, 2023.

23         In your typical scan of Mr. Sexton's inbox, would this be

24   an email that you would look into further or feel the need to

25   flag for Mr. Sexton's attention or action?

UNITED STATES DISTRICT COURT

```
 1        A      Not necessarily.  Again, I would have possibly
 2   mentioned to him that, You got another email, but most likely I
 3   would have left it in there in an unread state for him to
 4   review.
 5        We took the view -- actually, Glenn always took the view,
 6   for his own people, they are professionals and they're adults
 7   and it's not my job to be their mommy.  So I would treat him
 8   similarly; I would have left it.
 9             MS. LINZY:  Thank you, Ms. Fleming.  I have no
10   further questions.
11        Mr. Osaki may have some questions for you.
12             THE COURT:  Mr. Osaki, any cross-examination?
13             MR. OSAKI:  Yes.
14                        CROSS-EXAMINATION
15   BY MR. OSAKI:
16        Q      Ms. Fleming, I'm Carl Osaki.  I represent
17   Mr. Sexton.
18        A      Nice to meet you.
19        Q      One thing you said during your responses was when
20   you accessed Mr. Sexton's inbox through Outlook by proxy,
21   sometimes you would access it several times a day; is that
22   right?
23        A      Right.  I was in and out of both my own inbox and
24   his throughout the day.
25        Q      So if, for example, you went into Mr. Sexton's
```

1   ebox -- email inbox, came out of it and went back in, and that

2   first email is still sitting there?

3        A    Right.

4        Q    It would land on that one, too?

5        A    It would potentially, yes.

6        Q    Who was Mr. Sexton's supervisor at the time --

7        A    Oh.

8        Q    -- in 2023?

9        A    You know, Glenn has gone through so many supervisory

10   managers.  I'm not certain exactly who he reported to then.  I

11   don't know.

12       Q    Maybe Reed Hagman?

13       A    Reed was certainly one of his managers.  I don't

14   recall the dates and the timeline.

15       Q    As a Xerox employee, you would get notifications

16   from time to time about learning modules in the GEMS program?

17       A    Yes.

18       Q    And you would have to take them?

19       A    Mm-hmm.

20       Q    Yes?

21       A    Yes, standard process.

22       Q    All right.  So in this case we've seen the learning

23   module for the Mutual Arbitration Agreement.  It's made up of I

24   think four screens?

25       A    Right.

 1      Q      And at the end there's two boxes, one in green and

 2  one -- and a red one.  And the green one says Acknowledgement.

 3      A      I don't have a recollection, but I will accept that

 4  as the case.

 5      Q      Well, in your experience, if you don't hit that

 6  button at the end --

 7      A      Then it does not show that you have completed the

 8  module.

 9      Q      So you have to hit the button at the end to show

10  that you actually went through the screens?

11      A      Yes.  And as Rachel brought up, the list of those

12  who have not completed, we often would have people on the list

13  of not completed and it's simply because they had not taken the

14  final step of acknowledging whatever training, the security

15  policies or what have you.

16      Q      And Mr. -- I'm going to butcher his name --

17  Mahmutspahic --

18      A      I'm sorry.  Whom?

19      Q      One of the Xerox IT people --

20      A      Okay.

21      Q      -- testified that when you see these reports for

22  GEMS, you can't tell what the person actually did within the

23  GEMS learning module.

24      A      With some -- okay.  I'm going to go -- if I may, I'm

25  going to flip back to that report and see what the

1    terminology -- I don't remember what page that was on.  So hang

2    on.

3         Looking at page 5, if you scroll down and look at the

4    status, those that say Completed have completely finished all

5    requirements.  They've gone in and sometimes it is a course

6    that we have to go through.  Sometimes there are tests

7    involved.  Sometimes there's an acknowledgement.  Whatever was

8    required for this particular training, they have completed it

9    in full.

10        Not Started means they did not do anything.  They've not

11   even gone into the training.

12        And then you see the individual next to bottom that says

13   In Progress.  That means that they started it.  It could be

14   that they went through all of the training but merely neglected

15   to hit, I Acknowledge, and yes, I have no way to know what they

16   missed or whether they simply started it and then went out and

17   got busy.  We have no way to know exactly where they were in

18   that training status.

19        Q    Okay.  So for your -- I think you said you're kind

20   of the informal watchdog.  What you're interested in seeing is

21   completed --

22        A    Correct, correct.

23        Q    And you would be the one to follow up with those,

24   reporting to Mr. Sexton?

25        A    Yes.


                    UNITED STATES DISTRICT COURT

1    Q    Okay.  How many of these training modules would come

2  out each year generally?

3    A    Oh, a large number, and it depends on the year.

4  I -- I don't know for certain.

5    Q    When you say large number, what do you mean?  Like

6  one a month or --

7    A    We could have 6 to 12 off the top of my head,

8  depending upon various circumstances.

9    Q    Are any of these learning modules that Xerox would

10  send out notices of optional?

11    A    Yes, there are some optional trainings.

12    Q    And some of them are mandatory?

13    A    Correct.

14    Q    And it's the mandatory ones that you would get

15  reports on status?

16    A    Correct.

17    Q    Now, did you get any emails or see any emails from

18  Mr. Hagman to Mr. Sexton about Mr. Sexton's not completing the

19  learning module for the Mutual Arbitration Agreement?

20    A    Not to my recollection, and evidently it did not

21  come up very -- through my various email searches.

22    Q    All right.  So that when Mr. Harradine asked you to

23  go into Mr. Sexton's emails that were saved, you would have

24  looked for something like that?  An --

25    A    Most --

UNITED STATES DISTRICT COURT

1        Q      -- email from Mr. Hagman saying, "Hey, you didn't

2   complete it.  Complete it"?

3        A      Correct.  Now most of those searches that I was

4   asked to complete, I would do a word search.  So like if you go

5   into your inbox in your email, you know, looking for an email

6   about your dog, you're going to type in your dog's name and see

7   what comes up, for example.

8         So I would do word searches and try various different

9   things, and what I provided to them was whatever came up

10  through those searches.

11       Q      And you don't recall any phone calls from Mr. Hagman

12  that went into that you may have answered saying that

13  Mr. Sexton had not completed --

14       A      No.

15       Q      -- the learning module for the Mutual Arbitration

16  Agreement?

17       A      No calls that came through me, no.

18       Q      And did you get any other communications from

19  anybody in the chain of command at Xerox above Mr. Sexton,

20  including Mr. Hagman, about Mr. Sexton's not completing the

21  learning module for the Mutual Arbitration Agreement?

22       A      No.

23       Q      Mr. Hagman would email Mr. Sexton on other

24  occasions --

25       A      Yes.

UNITED STATES DISTRICT COURT

1       Q       -- regarding learning modules for people who had not

2    completed?

3       A       I believe so.  I believe that, yes, we would get

4    reminders about individuals that were delinquent in training.

5       Q       And that would mean that Mr. Hagman would also

6    receive reports like pages 5, 6, and 7 of Exhibit 14 himself

7    for the people who are reporting to him, correct?

8       A       Correct.

9       Q       So in this case for the Mutual Arbitration

10   Agreement, Mr. Hagman would have received reports like page 5,

11   6, 7 of Exhibit D-14 that would show that Mr. Sexton had not

12   completed the learning module for the Mutual Arbitration

13   Agreement?

14      A       Presumably so.

15      Q       And yet no follow up?

16      A       No, nothing that I have observed or seen.

17      Q       Did Mr. Harradine indicate to you when he asked you

18   to look for these emails -- and oh, by the way, this request to

19   you from Mr. Harradine occurred after this lawsuit was filed,

20   right?

21      A       Yes.

22      Q       In those conversations, did Mr. Harradine ask you to

23   look for follow-ups from Mr. Hagman or Mr. Sexton's supervisors

24   about this noncompletion of the learning module?

25      A       Honestly, I don't have clear recollection of

1    everything that I was asked to search for.  I could look

2    through my own emails and find that, but I don't recall just

3    off the top of my head.

4         Q    When you took the learning module and you got to

5    page 4 of the learning module and you pressed the green button,

6    what did you think you were doing?

7         A    Well, I have worked for a number of Fortune 500s

8    through my career -- Procter & Gamble, DHL -- and most of those

9    I was -- it was customary from my experiences, my employment

10   experience, that I would have been handed an employment manual,

11   and one of those items in there was arbitration agreements and

12   you had to sign for your employment manual.

13        Xerox does not have an employee manual that they give to

14   employees upon hire.  So when this arbitration agreement came

15   out, my personal experience, my view was it was routine; I

16   thought nothing of it, and I accepted it.

17        Q    Well, did you accept it or did you acknowledge it?

18        A    Probably acknowledge, but, yes.

19        Q    'Cause I want you to look at Exhibit 12.

20        A    Exhibit 12?

21        Q    Yes, D-12, on the fourth page.

22        A    Mm-hmm.

23        Q    See that last screen where it has the green box?

24        A    Mm-hmm.

25        Q    Now, the green box says -- what's in that green box,

1    the word?

2        A        "Yes."

3        Q        "Yes."  And what's next to the green box?

4        A        "Course completion."

5        Q        All right.  And underneath there's a red box and it

6    says?

7        A        "No."

8        Q        And next to the red box?

9        A        "Retake course."

10       Q        So either you completed the course or you didn't

11   complete the course?

12       A        Correct.

13       Q        And the No box is the same thing as if you didn't

14   click anything?

15       A        It reads that way.

16       Q        And above it, the page is entitled Acknowledgement

17   Completion?

18       A        Yes.

19       Q        And, "In accordance with Xerox's ethics policy, I

20   hereby confirm that I have read and understand the above

21   statements."  See that?

22       A        I do.

23       Q        So what you're acknowledging is that you read it --

24       A        Read it and you understood it.

25       Q        -- and you understand it?

     1        A      Right.  As you're pointing out -- and again, I

     2   completed this over two years ago myself -- I vaguely recall

     3   getting it and doing something.

     4        But, yes, one's interpretation could very well be that

     5   you're simply acknowledging it, not that you are accepting it.

     6        Q      Well, that's one interpretation, right?

     7           THE COURT:  I think, Mr. Osaki, we can wrap up this

     8   point.

     9           MR. OSAKI:  All right.  Okay.  That's all I got.

    10           THE WITNESS:  Okay.

    11           THE COURT:  Ms. Fleming, first let me see, any

    12   redirect?

    13           MS. LINZY:  No redirect, Your Honor.  Thank you.

    14           THE COURT:  I do have a few questions myself,

    15   Ms. Fleming.

    16        One is earlier in your testimony you mentioned that

    17   Mr. Sexton would often get sometimes a hundred emails in his

    18   inbox which does sound like a lot of emails.

    19           THE WITNESS:  Yes.

    20           THE COURT:  He was a person with a lot of

    21   responsibility in the company.

    22        Given that large number of emails, based on what you

    23   could observe while you were working with Mr. Sexton, was he

    24   able to stay on top of these emails as a general --

    25           THE WITNESS:  For the most part that is also part of

                          UNITED STATES DISTRICT COURT

1    the reason that I would scan through to see if there were

2    specific action items that might have been overlooked or needed

3    to be addressed.  So I would try to do that second layer to

4    catch and bring anything to his attention.

5              THE COURT:  Okay.  Would you say based on your time

6    at Xerox in the first half of 2023, that Xerox here in Hawai'i

7    had a corporate culture of taking seriously employees'

8    obligations to monitor their email communications and be

9    responsive with emails?

10             THE WITNESS:  Yes.  For the most part, yes.

11             THE COURT:  And based on at least your time at

12   Xerox, were there sometimes important messages that were sent

13   by email that an employee had to be paying attention to?

14             THE WITNESS:  Absolutely.

15             THE COURT:  One final question that I have is one of

16   the things that will come up -- this is not necessarily within

17   your own personal knowledge -- but I believe there will be some

18   suggestion that at some point in July of 2023, the internal

19   records for training showed that Mr. Sexton's training was in

20   progress, quote/unquote, and I just want to make sure I

21   understand your testimony about, you know, your reviewing your

22   own emails versus his and clicking on things.

23       Is there any possibility or is there a likelihood that

24   when Mr. Sexton's records showed training -- training in

25   progress, that that might have actually been clicks that you

1    had somehow done?

2              THE WITNESS:  No.  When you click on the links to go

3    into GEMS, there is a secondary login, and I would have had to

4    directly log into my GEMS account to do my training or his GEMS

5    account to look at status -- sorry -- of the training courses.

6         Now, if Glenn had merely accessed it to look at the

7    documents to peruse it, that could very well have shown him as

8    in progress.

9         Each course functions a little bit differently, but

10   merely clicking on that course in your GEMS learning can show

11   it as in progress because you looked at it.  It doesn't mean

12   you've done anything or read anything or completed anything.

13             THE COURT:  Right.  And even if it was just a brief

14   perusal or looking at it, if I'm understanding correctly, that

15   would have been something that Mr. Sexton would have done

16   himself?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  Let me now check to see if either

19   party -- since I have asked a few questions myself, does either

20   counsel have any follow-up questions for this witness?

21             MS. LINZY:  No, Your Honor, not from Xerox.

22             MR. OSAKI:  No, Your Honor.

23             THE COURT:  Your testimony is complete.  You may be

24   excused, Ms. Fleming.  Thank you.

25             MS. LINZY:  Thank you, Your Honor.

1          Xerox would now call Jeffrey Harradine and he will be

2    testifying via Zoom.

3               THE COURT:  Yes, we'll get that up in just a second.

4               MS. LINZY:  Your Honor, would you like me to go to

5    the lectern or --

6               THE COURT:  Either is fine.  If it's easier at your

7    table, that's also okay.

8               MS. LINZY:  I'm okay at the lectern.  Makes me feel

9    important.

10                         DIRECT EXAMINATION

11   BY MS. LINZY:

12        Q    Yes.  Good morning, Mr. Hagman.  How are you?

13        A    Good morning.  I'm well, thank you.

14        Q    Could you please state your name for the record?

15              THE COURTROOM MANAGER:  Sorry, I'm going to swear

16   him in real quick.

17              MS. LINZY:  Oh, I skipped ahead.  Sorry.

18         Just a second.

19              THE COURTROOM MANAGER:  No.

20         Good morning, Mr. Hagman.  Can you hear me?

21              THE WITNESS:  I can.  Thank you.

22              THE COURTROOM MANAGER:  Okay.  Perfect.  Can you

23   please raise your right hand for me?

24        **JEFFREY JOHN HARRADINE, DEFENDANT'S WITNESS, WAS SWORN**

25              THE COURTROOM MANAGER:  Thank you.  Please state

1    your name for the record, spell your first and last name,

2    please.

3            THE WITNESS:  Jeffrey John Harradine, J-e-f-f-r-e-y,

4    H-a-r-r-a-d-i-n-e.

5                          DIRECT EXAMINATION

6    BY MS. LINZY:

7        Q      All right.  Mr. Hagman, could you please tell the

8    Court your occupation.

9        A      I'm an attorney.

10       Q      Are you currently employed by Xerox?

11       A      I am.

12       Q      What is your position at Xerox?

13       A      I'm the Associate General Counsel at Xerox.

14       Q      How long have you held that position with Xerox?

15       A      Since June 1st, 2024.

16       Q      2024?

17       A      Yes.

18       Q      How long have you been employed with Xerox as a

19   whole?

20       A      Since August 2nd, 2021.

21       Q      What was your position in summer of 2023?

22       A      In 2023 I held the position of Senior Managing

23   Counsel for Litigation and Employment.

24       Q      Are you familiar with Xerox's Mutual Arbitration

25   Agreement?

1        A       I am.

2        Q       Is it also referred to as the MAA?

3        A       It is at times, yes.

4        Q       Did you have any involvement in the implementation

5    of Xerox's Mutual Arbitration Agreement?

6        A       I did.

7        Q       What was your involvement?

8        A       I was asked to shepherd the program through to

9    completion.  It had been begun before the COVID-19 pandemic

10   arose and was put on hold so that the company could address

11   pandemic-related issues.  In 2023 I was asked to shepherd that

12   through.

13            MS. LINZY:  Your Honor, we have submitted the

14   exhibits to Mr. Hagman.  He's printed them out.

15       Q       (BY MS. LINZY:)  I would like to ask you,

16   Mr. Hagman, to take a look at what has been premarked Exhibit

17   D-4.

18       A       I have D-4.

19       Q       Do you recognize this document?

20       A       I do.

21       Q       What is it?

22       A       This is the Mutual Arbitration Agreement that was

23   dispersed in April of 2023 to all nonunion U.S. employees of

24   Xerox.

25            MS. LINZY:  Your Honor, Xerox requests that Exhibit

UNITED STATES DISTRICT COURT

1    D-4 be entered into evidence.

2              THE COURT:  Any objection?

3              MR. OSAKI:  No.

4              THE COURT:  Exhibit D-4 is admitted.

5              (Exhibit D-4 received into evidence.)

6      Q    (BY MS. LINZY:)  Mr. Hagman, who was involved in, to

7    your knowledge, the decision to implement an arbitration

8    agreement for employment disputes at Xerox?

9      A    That decision was made by our executive leadership

10   team in consultation with members of the Office of General

11   Counsel and external counsel.

12     Q    Do you know what reason was discussed with Xerox

13   employees as to why Xerox was implementing an arbitration

14   agreement for employment disputes?

15     A    In dialog with employees, we explained that

16   arbitration was a faster, more efficient solution to address

17   employee/employer disputes, that it was used by many of our

18   peer companies in the U.S. for that reason, and that

19   statistically speaking, people found arbitration to be as fair,

20   if not more fair, than typical court-style litigation.

21     Q    When was the Mutual Arbitration Agreement

22   implemented at Xerox?

23     A    It became effective May 15th, 2023.

24     Q    Which employees did the MAA apply to?

25     A    All nonunion U.S. employees.

UNITED STATES DISTRICT COURT

```
 1        Q      What legal disputes would be subject to or resolved

 2   through the MAA?

 3        A      The MAA applies to all employee disputes that are

 4   not otherwise carved out in -- by the MAA.  That carve out is

 5   in paragraph 2.

 6        Q      Thank you.

 7         Would claims such as breach of contract and unpaid wages

 8   be included in that list of disputes subject to the MAA?

 9        A      Yes.

10        Q      And did Xerox intend for the MAA to be mandatory for

11   U.S. employees nonunion?

12        A      Yes.

13        Q      Was it intended as a term and condition of

14   employment with Xerox?

15        A      Yes.

16        Q      Did Xerox make that point clear in the MAA?

17        A      Yes.

18        Q      Could you point us to that, please, where it is.

19        A      If you look in the first paragraph, final sentence

20   of Exhibit D-4, it says, "Acceptance of this agreement is a

21   condition of continued at-will employment and continued at-will

22   employment constitutes acceptance of an additional

23   consideration for this agreement."

24        Q      Also looking at Exhibit D-4, I see it is referred to

25   as a Mutual Arbitration Agreement.  Could you explain why it is
```

1  provided that title?

2      A      Because it binds Xerox to its disputes with

3  employees and former employees just as the employees are bound

4  by it.

5      Q      And flipping through Exhibit D-4, which is a total

6  of four pages, I do not see a signature line anywhere in this

7  agreement for either Xerox or the employee to sign.  Why is

8  that?

9      A      Because acknowledgement of receipt of this agreement

10  and knowledge of its contents was handled through our

11  electronic education program which we colloquially refer to as

12  GEMS.

13      Q      Was there any other way to accept the agreement

14  besides the GEMS training module?

15      A      Well, to clarify, acceptance of this agreement was

16  accomplished through continued employment after May 15th, 2023.

17          We used the GEMS platform to provide additional copies of

18  the agreement, related Frequently Asked Questions to employees,

19  and for them to acknowledge that they had received the

20  documents and had reviewed them.

21      Q      Is this a normal procedure for Xerox to roll out or

22  impose new terms and conditions without acceptance by

23  signature?

24      A      We roll out policies that employees are expected to

25  observe as a term of their employment on a regular basis

    1    without the need for a countersignature.

    2         And, for example, our breach of -- I'm sorry -- our

    3    Business Ethics Code of Conduct that's released here, we have a

    4    training that goes along with it and we don't ask that an

    5    employee sign that they received a copy of the Business Ethics

    6    Code of Conduct.  They complete a training that confirms that

    7    they've reviewed it, they understand it, and they're expected

    8    to abide by it.

    9         Q    What about for compensation changes or commission

   10    plans?  Does Xerox provide for signatures on those?

   11         A    I have seen commission agreements that were signed,

   12    yes.

   13         Q    What happens if the employee fails to sign the

   14    commission plan?

   15         A    In my experience, they're paid along the plan

   16    whether they've signed it or not.

   17         Q    Did Xerox still plan to notify the current employees

   18    about this new term and condition of employment with the Mutual

   19    Arbitration Agreement?

   20         A    I'm sorry.  Could you ask that question again?

   21         Q    Yes.  Did Xerox plan to notify current employees

   22    about this new term and condition of employment with the

   23    arbitration agreement that it was implementing?

   24         A    We had an entire communications plan that

   25    implemented a series of notifications after the first

                        UNITED STATES DISTRICT COURT

1    notification to people managers and members of the senior

2    leadership team on April 19th.  It was a combination of

3    notifications, reminders, notification when you've completed a

4    training, but also a reminder if you went over the deadline and

5    hadn't completed the training, that this was still a term of

6    your employment.

7         Q     How many current employees in 2023 were you rolling

8    this agreement out to?  And I'm not asking for an exact number,

9    but if you could give us a rough estimate of how many nonunion

10   U.S. employees Xerox had in April of 2023?

11        A     It was rolled out to over 9,000 nonunion U.S.

12   employees.

13        Q     All right.  And you discussed that there were a

14   number of steps to this roll-out process, a number of

15   notifications that went out.

16          How were these distributed?

17        A     Through email and trainings.

18        Q     And why was email selected to be the vehicle that

19   was utilized for notifying the 9,000-plus employees about the

20   new term and condition of employment?

21        A     Email is a standard channel that is used at Xerox

22   for the communication of important information from -- for a

23   wide variety of topics of general interest to the company or

24   specific interest to the recipient.

25        Q     In relying upon email as the main method of

UNITED STATES DISTRICT COURT

1  notifying employees about the MAA, did anyone consider that

2  some employees may be less savvy on computers or with email?

3       A    Well, as a technology company and considering the

4  ubiquity of email in daily life, we were not concerned that

5  employees, given a fair opportunity to receive notice and

6  understand they were to review the documentation -- we weren't

7  concerned that this would slip through the cracks, effectively

8  too much notice and opportunity to review.

9       Q    What about employees on leave when the MAA was

10  rolled out?  How was that handled?

11       A    For employees that were on leave and, hence, their

12  email accounts would have been suspended, as I recall, we did a

13  combination of sending it to them through their personal email

14  and through the U.S. Postal Service.

15        I do recall there maybe had been a few employees on leave

16  who -- where email wasn't successful or viable for one reason

17  or another and which case they would have just gotten a post.

18  But we're talking something on the order of 80 to 85 employees

19  who were on leave at the time.

20       Q    Did Xerox consider that some employees might miss

21  the email or that it would get lost among the 50 to 100 emails

22  that an employee may receive in one day?  Was there any concern

23  about how that might occur?

24       A    Well, I think we were careful to mark it as

25  something that would grab attention, say, in the Re line in

UNITED STATES DISTRICT COURT

1    someone's inbox.  But that also explains why there were

2    multiple communications, and for people managers and senior

3    leadership teammates trainings, live trainings to assure that

4    everyone in the company knew about the arbitration agreement

5    and was completing their acknowledgements.

6        Q    And is it your understanding that Xerox has any

7    particular expectation of an employee to read emails that Xerox

8    sends to that employee?

9        A    Oh, yes.  We're expected to read, understand, and,

10   as necessary, respond to emails.  It is the standard channel

11   for communication again, as I said, for issues of general

12   interest to the entire company and specific interest to the

13   recipient.

14       Q    Has Xerox implemented any other policies, terms and

15   conditions of employment, or employee agreements by email other

16   than the MAA?

17       A    Policy updates.  I'm thinking right now again of the

18   Business Ethics Code of Conduct.  That is distributed by email

19   and everyone in the company is expected to abide by that.

20   That's a term of continued employment.

21       Q    Did Xerox take any steps to ensure that employees

22   actually received the email notification of the MAA?

23       A    Well, our system sent the notifications to their

24   active Exchange account or Microsoft email account, and our

25   system tracks the success or failure of emails such as that, as

UNITED STATES DISTRICT COURT

1    I understand it, and we also sent several emails to account for

2    any -- any chance that someone missed one or the other.

3        Q    And who at Xerox was responsible for ensuring that

4    the notices were sent out by email and received?

5        A    Well, the system is monitored by any number of

6    individuals at our XDX, our IT department.

7        I know that Ms. Morgan is able to access that data that's

8    aggregated by the system, but there are certainly others that

9    could as well.  Ms. Morgan was our internal communications

10    representative who assisted with the roll-out.  So I'd be

11    speculating, but I assume she had primary responsibility for

12    that.

13        Q    Were there any steps with the implementation that

14    were before providing the actual document to the employees?

15    Did Xerox take any sort of advance notice kind of steps to warn

16    any employees that it was coming?

17        A    We provided advance notice to our executive

18    committee, so people that were chief in their title.  Then we

19    provided notice to the senior leadership team, which is about

20    approximately a hundred of the top leaders just below the

21    executive committee.  And then we also gave notification and

22    training to all people managers at Xerox, and we use the term

23    people manager to mean if you have at least one direct report,

24    you're a people manager, and notice of the arbitration

25    agreement was given to them as well as three opportunities to

1  be trained and ask questions about it.

2      Q    What level of manager was Mr. Sexton in?

3      A    I believe -- he certainly was a people manager.  I

4  don't believe he was on the SLT at that time.

5      Q    So --

6      A    Senior leadership team, apologize.

7      Q    All right.  And were you a people manager in 2023?

8      A    I was.

9      Q    Did you receive the people manager advance notice to

10  your inbox?

11      A    I did.

12      Q    I'm going to ask you to take a look at what has been

13  premarked Exhibit D-1.

14      A    I have D-1.

15      Q    All right.  And for the record, D-1 is an email from

16  Xerox HR Communications dated April 14th, 2023.  The To line is

17  blank and the Subject line is Manager Advance Upcoming Mutual

18  Arbitration Agreement Launch.

19       Can you tell us what this document is?

20      A    This is the document that was -- the email that was

21  sent to all people managers in the U.S. who didn't manage

22  unionized staff.  And it was the email that we used to give

23  notice of the oncoming Mutual Arbitration Agreement, also to

24  give access to the agreement and the Frequently Asked Questions

25  that we had prepared as well as the discussion guide, all of

1    which you can see in these links on D-1, and to invite people

2    managers to attend one of three briefing sessions that we

3    scheduled at various dates and times to account for people's

4    schedules so people managers could attend, receive a training

5    and briefing on it, and ask any questions they might have.

6         Q     All right.  And Ms. Morgan has previously testified

7    a bit to explain why this document does not have any names in

8    the To line, but could you just for us to understand today --

9    what is your understanding as to why this document does not

10   have an addressee?

11        A     My understanding is this is the template that was

12   prepared and fed into our communication system which then

13   disseminates the message to all people managers, and the

14   received copy would have that To line filled in with the name

15   and email address of the recipient.

16        Q     And looking at the text of the email, it seems to

17   indicate that there were documents linked to the message or

18   linked within the message?

19        What documents do you recall being included within this

20   message?

21        A     The first hyperlink on the Word agreement was a copy

22   of the Mutual Arbitration Agreement itself, which was Exhibit

23   D-4.

24        The second document hyperlinked at Frequently Asked

25   Questions was a set of questions that we anticipated people

UNITED STATES DISTRICT COURT

1    managers or employees might have and we provided answers so

2    that the people manager could engage with their employee on

3    those questions.

4         And then the third hyperlink, which is marked This

5    Discussion Guide, was a guide that we had put together to

6    assist people managers who employees had not completed the

7    training and verified acknowledgement through the GEMS system

8    leading up to the due date.

9         Q    All right.  And in looking again at the text of this

10   Exhibit D-1, in the paragraph where it identifies or links the

11   agreement and the Frequently Asked Questions, it asks at the

12   end -- or it informs at the end that, "The people managers'

13   employees will be asked to acknowledge they reviewed the

14   agreement by its effective date of May 15th, 2023."

15        Is that the effective date that was selected for the

16   implementation of the agreement?

17        A    Yes.

18        Q    All right.  The email also informs people managers

19   that, "If their employees haven't acknowledged the agreement as

20   the effective date approaches, that they will be notified and

21   prompted to follow up with individuals or team members and

22   discuss the Discussion Guide there."

23        How would the follow-up notifications be provided?

24        A    Via email.

25        Q    And would that be the normal course of business for

1    Xerox trainings and acknowledgments within GEMS?

2         A    Yes.  For all mandatory trainings assigned to an

3    employee, their immediate manager gets notification when a

4    training is completed and we also get weekly reports if a

5    mandatory training has been assigned but has not yet been

6    completed.

7         Q    And as a people manager, did you understand that if

8    you got a report that your direct report had not completed a

9    required training, that you were expected to reach out and

10   notify or follow up with that employee in some form or fashion

11   to complete the course?

12        A    Yes, that was one option.  Sometimes if an employee

13   has sufficient time before the due date, you let them get there

14   on their own power.  But as the deadline approaches, yes, that

15   is my habit.

16        Q    And was that your understanding that of a common

17   practice within Xerox, an expectation that the manager follow

18   up to ensure that the trainings are completed?

19        A    Yes, because the responsibility to complete all

20   mandatory trainings sit both with the employee and the manager.

21        Q    Mr. Harradine, did you receive this message in your

22   inbox on May 14th, 2023, the manager inbox that is in the

23   Exhibit D-1?

24        A    Yes, I did.

25             MS. LINZY:  Your Honor, Xerox moves for the

UNITED STATES DISTRICT COURT

1    admission of Exhibit D-1 into evidence.

2              THE COURT:  Any objection?

3              MR. OSAKI:  No.

4              THE COURT:  Exhibit D-1 is admitted.

5              (Exhibit D-1 received into evidence.)

6         Q    (BY MS. LINZY:)  Mr. Harradine, you discussed a

7    little bit and the email at the bottom there talks about the

8    briefing sessions.  What was the purpose of conducting manager

9    briefing sessions before the employee notice email went out?

10        A    It was our intent to empower people managers in this

11   case -- pardon me -- with information that they could use to

12   socialize this message and answer any questions they might have

13   from their employees about this program.

14             We provided background about how a program like this is

15   used in our peer companies and it's rather common these days in

16   companies of our size.  We explain the benefits.  We explain

17   the resources that people managers had for this project.  And

18   we explain the importance of acknowledgement, but that the

19   agreement would be enforceable if an employee elected to remain

20   employed after the deadline.

21        Q    And I probably should have asked you this question

22   before this last one, but did you attend the manager briefing

23   sessions?

24        A    I was one of the presenters, so I attended all

25   three.

1    Q    Was there any follow-up to check whether managers

2  did discuss this arbitration agreement with their employees?

3    A    Not by me, no.

4    Q    Why not?

5    A    We had set up the system to provide periodic notices

6  and reminders of any outstanding acknowledgement completion.

7  Managers were getting weekly updates of completions or lack

8  thereof.

9        The training explained the importance of the

10  acknowledgement, but the effect of continued employment.  So

11  these multiple channels of information was how we elected to

12  roll out the agreement and check compliance.  There wasn't an

13  additional affirmative step at a global level.

14        Managers may well have contacted their employees on a

15  one-off basis.  I'm -- I'm not aware of that; I didn't have to

16  do that.  All of my directs completed their acknowledgement.

17    Q    Are you aware of any employees asking questions or

18  having some concerns related to either the HR department or the

19  legal department about the arbitration agreement being rolled

20  out?

21    A    Yes.  We did receive some questions about the

22  agreement directly from employees.  They were routed -- they

23  tended to be routed through HR, and HR would consult with legal

24  and provide responses.  But there were -- they were sparse.  If

25  I had to estimate to the best of my recollection, under 10.

UNITED STATES DISTRICT COURT

1       Q       Do you recall if any of those questions were relayed

2   by people managers on behalf of their employees?

3       A       As I sit here today, I don't remember if it was

4   direct -- only directly from the employee or a combination of

5   employee and relayed through people managers.

6       Q       All right.  The next step, as I understand it, in

7   the rollout was the all nonunion employee email notice of the

8   Mutual Arbitration Agreement that was referenced in this

9   Exhibit D-1.

10       I'm going to ask you to take a look at what's been

11   premarked Exhibit D-3.

12       A       I have D-3.

13       Q       Do you recognize this document?

14       A       I do.

15       Q       And what is the subject line of this document?

16       A       The subject line reads Action:  Acknowledge the

17   Mutual Arbitration Agreement by May 15, 2023."

18       Q       Again, we've got another document with no addressees

19   in the To line.  Could you explain why that may be?

20       A       This is also a template that we prepared as part of

21   the communications plan that was fed into the email system and

22   then distributed to specific people.  In this case it would be

23   all U.S. nonunion employees.

24       Q       And does all U.S. nonunion employees include

25   Mr. Sexton?

UNITED STATES DISTRICT COURT

1    A    Yes.

2    Q    Did it include you?

3    A    Yes.

4    Q    And did you receive this email as reflected in D-3

5    to your inbox?

6    A    I did.

7         MS. LINZY:  Your Honor, Xerox moves to admit Exhibit

8    D-3 into evidence.

9         THE COURT:  Any objection?

10        MR. OSAKI:  No objection.

11        THE COURT:  Exhibit D-3 is admitted.

12        (Exhibit D-3 received into evidence.)

13   Q    (BY MS. LINZY:)  Mr. Harradine, could you just give

14   us a general description of the main points that were addressed

15   in this email which reflects the date of April 19th, 2023?

16   A    It covers much of what I described as covered in the

17   people manager training.  It explained what the company saw

18   were the benefits of arbitration, that other peer companies

19   employed arbitration to resolve employee disputes.  And we also

20   provided access to the AAA's overview of employment arbitration

21   since AAA was our selected adjudicator of these sort of

22   disputes.

23        And we provided a deadline for completion, access to the

24   agreement itself, direct access to the acknowledgement training

25   module in GEMS, access to the Frequently Asked Questions, and

UNITED STATES DISTRICT COURT

1    an opportunity to -- for any employee to ask questions if they

2    had by going through what we call or did call My HR Connection.

3    It was the HR clearinghouse for employee questions of this

4    sort.

5        Q    Looking at the email in the middle, I believe it

6    says in bold there, "Please read and acknowledge the terms of

7    the MAA by May 15th, 2023."

8        Could you explain why that might be in bold?

9        A    To draw particular attention by the reader and to

10   underscore the importance of that directive.

11       Q    All right.  And then it says, "The agreement

12   requires arbitration of most legal disputes between Xerox and

13   employees after this date."

14       Sorry.  Going to move on.  And the, "Number one, click

15   here to read the MAA," "click here" is in red.  Was that a

16   hyperlink to the MAA?

17       A    It was.

18       Q    And we've looked at that in Exhibit D-4; is that

19   correct?  Is that what would have been linked in that email?

20       A    Yes.

21       Q    All right.  And looking at Exhibit D-4 really

22   quickly, in bold in the second paragraph, could you read that

23   for the Court?

24       A    (Reading:)  "If employee does not wish to accept and

25   be bound by the terms of this agreement, employee must

UNITED STATES DISTRICT COURT

 1    terminate their employment before the effective date of this

 2    agreement, May 15, 2023."

 3         Q     And going back again to Exhibit D-3, have you flip

 4    back and forth a little bit, you referenced it in your

 5    discussion of what all was linked, but at the bottom it says,

 6    "For more details about the MAA, click here for a set of

 7    Frequently Asked Questions."  I believe you referenced the

 8    FAQs.

 9         Could you take a look for me at what has been premarked

10    Exhibit D-5.

11         A     I have D-5.

12         Q     Are these the Frequently Asked Questions that would

13    have been linked in Exhibit D-3?

14         A     Yes.

15         Q     Do the FAQs explain again that the Mutual

16    Arbitration Agreement is mandatory?

17         A     That's number six on the list of Frequently Asked

18    Questions.

19         Q     Could you read that paragraph for us, please.

20         A     Question number six is, "Is the MAA mandatory?"

21         The answer is, "Yes.  If you are still employed by the

22    company on May 15, 2023, the MAA automatically applies to you.

23    Assent to the terms of the MAA is a condition of your continued

24    employment after that date."

25              MS. LINZY:  Your Honor, Xerox moves for the

UNITED STATES DISTRICT COURT

1    admission of Exhibit D-5 into evidence.

2              THE COURT:  Any objection?

3              MR. OSAKI:  No objection.

4              THE COURT:  Exhibit D-5 is admitted.

5              (Exhibit D-5 received into evidence.)

6         Q    (BY MS. LINZY:)  All right.  After the manager

7    briefing session and the email notification to all employees,

8    were any other steps involved in the implementation of the

9    Mutual Arbitration Agreement?

10        A    As I recall the communications plan, there were

11   follow-up messages that were sent after the initial rollout for

12   those who hadn't completed the acknowledgement training.  And

13   as we discussed, there were separate messages sent to people

14   managers that indicated whether an employee had or had not

15   completed the acknowledgement training.

16        Q    Well, let's talk about the acknowledgement training

17   real quickly.

18         Was it identified or marked within the system as a

19   required training?

20        A    Yes.

21        Q    And what does that mean exactly?  That a training is

22   required?

23        A    Xerox rolls out certain trainings throughout the

24   year that are mandatory for certain classes or in some cases

25   all employees.  Our antibribery training is an example of that,

1    the business ethics –– the Business Ethics Code of Conduct

2    training is an example of that.

3        A training that is mandatory must be completed by all

4    employees for which it is mandatory.

5        Q    And how was the training conducted for the Mutual

6    Arbitration Agreement?  Was this online?

7        A    It was online, as are all of our trainings.

8        Q    All right.  What was the purpose of including this

9    online training aspect as part of the implementation of the

10   Mutual Arbitration Agreement?

11       A    The online GEMS training was a common channel for

12   rolling out information and training for Xerox employees.  It's

13   also an auditable dataset that we can look at and see who

14   completed what and when.

15       We have the ability through the GEMS training to

16   incorporate hyperlinks and documents, so it was another

17   opportunity for employees going through the acknowledgement

18   process to click on any of the documents we've been talking

19   about, review them, start showing them to a spouse, show them

20   to an attorney, and then come back and complete the

21   acknowledgement.

22       Q    All right.  I'd like you to take a look at what's

23   been premarked Exhibit D-12.  Do you recognize ––

24       A    I have D-12.

25       Q    Okay.  Sorry.  Do you recognize what D-12 is?

1       A      Yes.  These are screenshots from the GEMS

2  acknowledgement training that we've been talking about.

3              MS. LINZY:  Your Honor, Xerox requests that Exhibit

4  D-12 be entered into evidence.

5              THE COURT:  Any objection?

6              MR. OSAKI:  No objection, Your Honor.

7              THE COURT:  Exhibit D-12 is admitted.

8              (Exhibit D-12 received into evidence.)

9       Q      (BY MS. LINZY:)  All right.  Mr. Harradine, looking

10  at the Introduction and Purpose screen, did that provide

11  another link to the Mutual Arbitration Agreement document

12  itself?

13      A      Yes.  I believe it was the first reference to the

14  Mutual Arbitration Agreement was the link.

15      Q      It looks a little faded out, but like a grayish --

16      A      Well, that's what I'm -- well, that's what I'm

17  struggling with.  If not the first, it was the MAA and it

18  frankly could have been both.  As I sit here, I don't recall if

19  it was either or both.

20      Q      All right.  And this screen also notes that, "Your

21  continued employment after May 15th, 2023, constitutes

22  acceptance of the terms and conditions of the MAA."

23         Could you help us understand why this language was

24  reviewed in the training?

25      A      To underscore that this was going to be a mandatory

UNITED STATES DISTRICT COURT

1   term of employment after May 15th and that an employee who

2   elected to continue with Xerox after that date would be

3   assenting to that new term.

4        Q    All right.  And other than the exhibit -- the email

5   in Exhibit D-3, were employees notified in any other way of

6   their requirement to complete this training module?

7        A    Yes.  They received reminders if they didn't

8   complete after a period of time before the due date.

9        Q    You referenced before that this was an audible[*sic*]

10  method of rolling out this agreement to determine and track

11  whether or not employees completed it.

12       Do you know if Xerox did indeed track whether employees

13  completed this training module and acknowledged the MAA?

14       A    Yes, that's data that was tracked and is available.

15       Q    Was there anyone at Xerox who was in charge of or

16  able to pull the information demonstrating the training was

17  completed?

18       A    Yes.  Ajdin, who is one of our XDX members who has

19  responsibility for GEMS training, had access to that data and

20  can pull it.

21       Q    And I'm going to ask you to try and pronounce his

22  last name just so we can make sure we know who we're speaking

23  of on the record.

24       A    I -- I'd rather not butcher his name out of great

25  respect for him.  He's the gentleman who testified in this case

UNITED STATES DISTRICT COURT

1    in deposition several weeks ago.

2        Q    Thank you.  All right.

3        I'm going to ask you to take a look at what has been

4    premarked Exhibit D-13.

5        A    I have D-13.

6        Q    And Ajdin has testified about this document already,

7    but it is an excerpt or a filtered report of status completion

8    on the MAA training module filtered to Mr. Sexton.  It's very

9    tiny print.

10        But in the Learning Assignment Status column, which is I

11    think the fifth column over, it notes, "In Progress."

12        What did you understand that to mean?

13        A    My understanding is that In Progress is the system's

14    way of telling us that the training has begun but has not been

15    completed.  We have the ability at Xerox to start and stop our

16    trainings if we're interrupted or if we'll do some today and

17    some tomorrow.  So that's what that denotes.

18        Q    And was this the type of information that Ajdin was

19    able to pull to track an employee's completion of the MAA

20    training?

21        A    Yes.  As I recall, I received at least two and

22    potentially additional spreadsheets over the course of the

23    month between rollout and implementation which showed progress

24    toward completing our acknowledgements.  And Mr. Sexton's

25    information would have been baked in to that dataset, but it

1    was for all 9,000 and some employees, so I didn't specifically

2    scrutinize his progress.

3        Q    Did you identify or come to understand in that

4    report how many employees had completed the training?

5        A    The last report I received was on July 6th, 2023, as

6    you can see here in D-13.  And at that point my recollection is

7    all but approximately 200 employees had completed their

8    acknowledgements.

9        Q    So was this about a 98 percent completion rollout

10   that was accomplished here?

11       A    Somewhere between 97 and 98 percent, an

12   exceptionally high return rate.

13       Q    Just by way of comparison, do you know or did you

14   track how complete completion was on the required Code of

15   Business Conduct training?

16       A    I don't track that specifically, a member of my team

17   does.  But my recollection from last year was that we didn't

18   reach 95 percent in the Business Code of Conduct training.

19            MS. LINZY:  Your Honor, I neglected to do this

20   earlier.  Xerox moves to admit Exhibit D-12 into evidence.

21            THE COURT:  Okay.  Any objection --

22            MS. LINZY:  I'm sorry.  Maybe I did do that one

23   already.

24            THE COURT:  I think D-12 has been admitted.  Are you

25   referring to D-13?

1          MS. LINZY:  D-13.

2          THE COURT:  Any objection to D-13, which is the

3    learning item report?

4          MR. OSAKI:  To Glenn dated July 6th?

5          THE COURT:  That's correct.

6          MR. OSAKI:  No, no objection.

7          THE COURT:  Okay.  D-13 is admitted.

8        And we are actually going to take a short -- we're just

9    going to take a short 5-minute break before we resume.  So it

10    is 10:21 now.  I'll look forward to seeing all counsel back at

11    10:26 to continue Mr. Harradine's testimony.

12          (Exhibit D-13 received into evidence.)

13          MS. LINZY:  Thank you.

14          (A recess was taken.)

15          THE COURT:  Welcome back, counsel, Mr. Sexton, and

16    Mr. Harradine.

17        Ms. Linzy, you may continue with your direct.

18          MS. LINZY:  Thank you.

19     Q    (BY MS. LINZY:)  Mr. Harradine, before the break, we

20    were discussing the training module for acknowledging the

21    Mutual Arbitration Agreement within GEMS.  What happened if the

22    due date passed, which I believe was May 15th, 2023, and the

23    employee did not complete the training module and acknowledge

24    the MAA?  What happened?

25     A    The employee would get an email notification

1   advising that they had not completed the training, but the

2   effect of continued employment on the application of this new

3   term to their employment, and the people manager would have

4   received a notification in the training summary of a past due

5   training.

6        Q    All right.  I'm going to ask you to take a look at

7   what has been premarked Exhibit D-10 in your book or your

8   printouts.

9        Exhibit D-10, for the record, is an email from Xerox HR

10  Communications with the subject line Test Email Mutual

11  Arbitration Agreement Applicable as of May 15th, 2023.

12       Mr. Harradine, do you recognize this document?

13       A    I do.

14       Q    And again, it's -- it doesn't look like a complete

15  email as it's missing a sent date and a To addressee.  Could

16  you explain why that might be?

17       A    This is another template that we prepared as part of

18  a communications plan, and it would have served as the basis

19  for individual emails sent to the 200-odd employees who did not

20  complete the acknowledgement.

21       Q    All right.  And why was this sent out?

22       A    It was our intent to make sure there was clarity

23  with employees who had not completed the acknowledgement that

24  the failure to complete the mandatory training did not absolve

25  them of observance of the Mutual Arbitration Agreement just as

UNITED STATES DISTRICT COURT

1    Xerox was now bound by it as well.

2              MS. LINZY:  All right.  Your Honor, Xerox moves to

3    admit Exhibit D-10 into evidence.

4              MR. OSAKI:  No objection.

5              THE COURT:  Mr. Osaki, any objection?

6              MR. OSAKI:  No objection.

7              THE COURT:  With the understanding we discussed

8    earlier this morning, Exhibit D-10 is admitted.

9              (Exhibit D-10 received into evidence.)

10     Q    (BY MS. LINZY:)  All right.  Mr. Harradine, are you

11   aware that in this litigation Mr. Sexton denies receiving or

12   opening these email notifications and completing the training

13   module?  Are you aware of that?

14     A    I'm aware that Mr. Sexton has supplied declarations

15   where he discusses those topics, yes.

16     Q    And if -- if Mr. Sexton did not receive the email in

17   D-1, and did not receive the email in D-3, and did not complete

18   the training in D-12, and did not receive or read the email in

19   Exhibit D-10, how else could Mr. Sexton have become aware in

20   general that Xerox was implementing an arbitration agreement?

21     A    If he received none of the messages or accessed the

22   training, he still would have received notifications regarding

23   his direct reports, whether they had completed or not completed

24   the training.

25          But formal communications, I think you've covered the

UNITED STATES DISTRICT COURT

1    plan.  I can't speak to any individual communications he might

2    have had with his directs or others at the company.

3        Q    All right.  And I'm going to have you take a look

4    briefly at what has been premarked Exhibit D-6.  Ms. Morgan has

5    testified about this document.  It has a title of April 19th,

6    2023, Email Click Report.  And Ms. Morgan has testified that

7    this is a Poppulo, P-o-p-p-u-l-o, record within Xerox that

8    demonstrates the email in Exhibit D-3 was emailed to

9    Mr. Sexton's email address and it was opened eight times and

10   clicked twice.

11        Is that your understanding of what this document

12   reflects?

13        A    That's what it says, yes.

14        MS. LINZY:  All right.  Your Honor, in addition to

15   the testimony that Ms. Morgan gave regarding Exhibit D-6, Xerox

16   moves for the admission of D-6 into evidence.

17        THE COURT:  Any objection?

18        MR. OSAKI:  No, Your Honor.

19        THE COURT:  Then Exhibit D-6 is admitted.

20        (Exhibit D-6 received into evidence.)

21        Q    (BY MS. LINZY:)  Along the same lines,

22   Mr. Harradine, if you could take a look at Exhibit D-9 which

23   has the title of Glenn Sexton Activity Report for April 19th,

24   2023, Email.

25        A    I have Exhibit D-9.

1      Q     Great.  This was also testified to about by

2  Mr. Morgan as another Poppulo report with further information

3  as to when the email was opened eight times and which links

4  were clicked and when.

5       Is that your understanding of what this document

6  reflects?

7      A     Yes.  The prior document, D-6, lists two clicks and

8  eight opens.

9       Exhibit D-9 delineates when those clicks and openings

10  occurred and lists an IP address from which that occurred --

11           MS. LINZY:  Your Honor --

12           THE WITNESS:  -- and also the object that was

13  clicked.  Pardon me.

14           MS. LINZY:  Yes.  Thank you.

15       Your Honor, Xerox moves for the admission of Exhibit D-9

16  into evidence.

17           THE COURT:  Any objection?

18           MR. OSAKI:  No objection.

19           THE COURT:  Exhibit D-9 is admitted.

20           (Exhibit D-9 received into evidence.)

21      Q     (BY MS. LINZY:)  All right.  One last one of these

22  Poppulo records, if you could turn to Exhibit D-11 for me.  It

23  is titled June 5th, 2023, MAA Reminder Email Click Report.

24       Mr. Harradine, do you know what the June 5th, 2023, MAA

25  reminder email is?

UNITED STATES DISTRICT COURT

1        A     That was a message that we had prepared as part of

2   the communications plan to remind people that the deadline had

3   come and gone and the MAA was now in effect.  And this message

4   would have gone per that communications plan only to those who

5   had not yet completed the acknowledgement.

6        Q     The message contained within that June 5th, 2023,

7   MAA reminder email, would that be reflected in Exhibit D-10

8   that we just looked at, the test email?

9        A     Yes.  My recollection is this is the June 5th email

10  that connects -- D-10 is the June 5th email template that

11  connects to D-11, the D-11 report, yes.

12       Q     All right.  And in D-11, this Poppulo report

13  indicates that the June 5th, 2023, MAA reminder email sent to

14  Mr. Sexton's email address was opened twice.  Is that what you

15  see reflected in Exhibit D-11?

16       A     That's what the system is telling us in this

17  document D-11.

18            MS. LINZY:  In addition to the testimony from

19  Ms. Morno-Wade regarding D-11, Xerox moves to admit Exhibit

20  D-11 into evidence.

21            THE COURT:  Any objection?

22            MR. OSAKI:  No objection.

23            THE COURT:  Exhibit D-11 is admitted.

24            (Exhibit D-11 received into evidence.)

25       Q     (BY MS. LINZY:)  All right.  Mr. Harradine, once

UNITED STATES DISTRICT COURT

1    becoming aware of Mr. Sexton's declaration indicating that he

2    had not read the MAA and that his assistant would review his

3    email inbox, did you do anything to determine if there were

4    emails that are shown in D-1, D-3, and D-10 within Mr. -- or to

5    Mr. Sexton's inbox directly?

6         A     Yes, I did.

7         Q     What did you do?

8         A     I contacted Ms. Fleming, who was Mr. Sexton's

9    executive assistant at the time, that these messages were being

10   sent, and I learned that it was their practice in that office

11   to not house all emails on the Exchange server, which is

12   typical practice at Xerox.  Instead, they were housed on local

13   copies Microsoft PST files, and Ms. Fleming had access to those

14   PST files.

15        And once I learned that, I asked her to search those PST

16   files for emails discussing arbitration generally to determine

17   whether the emails I couldn't find on the Exchange server were

18   found on the local copies.

19        Q     And if you could turn to what has been premarked

20   Exhibit D-14 and has been admitted into evidence, do you

21   recognize these 18 pages as copies of the emails that

22   Ms. Sexton[*sic*] found on Mr. Sexton's inbox regarding the

23   arbitration agreement?

24        A     I believe so.  Also, as I recall, she sent me copies

25   of the PSTs for these months, and I searched them as well and

1    found these.

2                THE COURT:  And just for -- just as clarification,

3    these are the copies of emails that Ms. Fleming found in

4    Mr. Sexton's inbox?

5                MS. LINZY:  Yes.

6                THE COURT:  Okay.

7        Q    (BY MS. LINZY:)  In this Exhibit D-14, is there an

8    email indicating that Xerox sent the manager advance notice of

9    the MAA to Mr. Sexton or the communication that we have seen in

10   Exhibit D-1?

11       A    Yes.  The first page of D-14 is the individual copy

12   sent to Mr. Sexton of the template email D-1 that we looked at

13   earlier.

14       Q    When does this appear to have been received in

15   Mr. Sexton's inbox?

16               MR. OSAKI:  Excuse me, Your Honor.  The first page

17   of Exhibit D-14 is incomplete, and I'm assuming that the

18   complete email that's the first page of D-14 looks like D-1

19   which has Suzan Morno-Wade's signature as well as two other

20   sessions for people managers which don't really appear on this

21   one.

22               MS. LINZY:  Yes.  And --

23               THE WITNESS:  Your Honor, I can clarify that, if

24   it's helpful.

25           I think when I was reviewing these papers, I saw that --

1    what Mr. Osaki's referring to -- and some of the pages appear

2    to be out of order.

3        The second page that he's referring to is later in the

4    stack.  So I've just put them together so I have a complete

5    set, but I believe the entire email is in the stack; it just

6    may be a few pages out of order.

7        MR. OSAKI:  Okay.  I see it on page 4.

8        THE COURT:  Yes.  Thank you.  I -- Mr. Osaki, I

9    appreciate your flagging that so we could clarify for the

10   record and I appreciate the clarification.

11       MS. LINZY:  I think just to make sure, Exhibit D-14,

12   the first page and the third page are the initial manager

13   advance email, and then we have the second page of D-14 and the

14   fourth page are the April 19th email.  They just got out of

15   order.

16       THE COURT:  Let me just make sure that I have this

17   clear for the record.

18       So it looks like page 1 of D-14 ends with a reference to

19   Session 1.

20       And then there is a page 4 that looks like it's supposed

21   to be a page 2 that begins with the reference to Session 2 and

22   Session 3.

23       Are pages -- just so I'm understanding this

24   correctly -- are pages 1 and pages 4 the two pages of the same

25   email so that when put together, there's now a reference to

UNITED STATES DISTRICT COURT

1    Session 1, Session 2, and Session 3?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  And then again, just so I'm

4    understanding this correctly, Ms. Linzy, Mr. Harradine, when I

5    look at page 2 and page 3 of Exhibit D-14, it looks like at the

6    bottom of page 2, it ends with Suzanne Morno-Wade's name, and

7    the top of page 3 of D-14 has Ms. Morno-Wade's title EVP and

8    CHRO.  And so I'm assuming, Mr. Harradine, that pages 2 and 3

9    of D-14 also go together?

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  Okay.  Now, thank you, Ms. Linzy.  You

12   can continue.

13        Q    (BY MS. LINZY:)  All right.  Is there an email in

14   the Exhibit D-14 that shows Xerox sent Mr. Sexton the all

15   employee notice and launch email that we have seen in Exhibit

16   D-3?

17        A    Yes.  The second email in the stack, once we account

18   for the page inconsistency, is that all hands email that went

19   to all U.S. nonunion employees, including Mr. Sexton.

20        Q    And when does it appear that this one was received

21   into Mr. Sexton's inbox?

22        A    Wednesday, April 19th, 2023, at 2:11 P.M.

23        Q    All right.  Were there emails within Exhibit D-14

24   reminding Mr. Sexton to complete the required mandatory

25   arbitration agreement training?

1      A      Yes.  You'll see there's an email marked May -- or

2   dated Monday, May 8th, 2023, and it's a 7-day reminder to

3   Mr. Sexton to complete his MAA training and it provides the

4   links to the module in GEMS.

5          There is another reminder dated May 12th, same form but

6   now this is three days before the due date.

7          There was a message sent on the 20th of May, 2023,

8   notifying him of an overdue training completion but still

9   inviting that completion as soon as possible.

10          The same email was again sent on May 27th, again -- 2023,

11   again soliciting completion as soon as possible.

12          Another overdue notification on June 3rd, 2023.

13          Another notification on June 5th, 2023, June 10th, 2023,

14   June 17th, 2023, and June 24th, 2023.

15      Q      Were there emails within Exhibit D-14 notifying

16   Mr. Sexton whether his direct reports had completed the

17   required MAA training?

18      A      Yes.  There's an email dated April 21, 2023, which

19   you can see the names and email addresses are redacted, but it

20   lists employees who had completed their training, had not

21   started their training, or whose training had been started but

22   not completed.

23          There's another report August 7th, 2023 --

24      Q      Sorry.  That's an archived date?

25      A      Right.  August 21st -- okay.  So that's -- that's

1    another one, and it shows started/in progress for directs.

2        April 28th, another showing completed or in progress, so

3    three in this stack.  And they're in the format that I receive

4    when I have direct reports who have trainings assigned,

5    whether -- that have been completed or not.

6        Q    Is there an email in Exhibit D-14 showing Xerox sent

7    Mr. Sexton the follow-up reminder email that he was now subject

8    to the MAA that we have seen in Exhibit D-10?

9        A    Yes.  It's one of the emails I've referenced when I

10   was reviewing through -- going through the stack.

11        It's dated June 5th, 2023, and it notes that, "Despite

12   failing to complete the acknowledgement, the MAA now applies as

13   a new term of your employment by Xerox or a Xerox subsidiary."

14        Q    Are you aware of any complaints from Mr. Sexton or

15   questions from Mr. Sexton during his employment about the MAA

16   now applying to him?

17        A    I'm aware of neither.

18        Q    Are you aware of Mr. Sexton contacting legal or

19   human resources or any other level of management to inquire

20   whether Xerox could impose an arbitration agreement without

21   negotiating the terms with him?

22        A    I -- I'm not aware of any such communication.

23        Q    Mr. Harradine, are you aware if Mr. Sexton continued

24   his employment with Xerox after May 15th, 2023, the effective

25   date of the MAA?

 1        A     Yes.

 2        Q     Do you know how long he continued his employment

 3   with Xerox?

 4        A     I believe he continued through the end of 2023 and

 5   separated sometime in early 2024.

 6        Q     We talked earlier about the over 9,000 employees

 7   that this MAA was rolled out to, and the between 97 and 98

 8   percent completion rate of those 9,000 completing the

 9   acknowledgement within GEMS.

10        Are you aware of any employees who quit rather than be

11   subject to the MAA or stating that that was the reason they

12   were resigning?

13        A     I'm aware of no employee who chose to separate

14   because of the MAA.

15             MS. LINZY:  Your Honor, I'll pass the witness.

16             THE COURT:  Thank you.

17        Any cross-examination, Mr. Osaki?

18             MR. OSAKI:  Yes, Your Honor.

19                          CROSS-EXAMINATION

20   BY MR. OSAKI:

21        Q     Mr. Harradine, I'm Carl Osaki.  I represent Glenn

22   Sexton.

23        A     Good morning.

24        Q     You've had an opportunity to review the deposition

25   transcripts of Ms. Morgan and Ajdin, yes?

UNITED STATES DISTRICT COURT

1      A      I have not reviewed those transcripts.

2      Q      This Mutual Arbitration Agreement, one of the issues

3   surrounding these arbitration agreements for big employers like

4   Xerox is that it asks employees to give up their access to the

5   courts, right?

6      A      Yes.  It's -- it selects an arbitral format instead

7   of a court format, that's correct.

8      Q      And one of the issues with that is the employee is

9   being asked to forego a jury to decide a dispute, correct?

10     A      Yes.  The arbitrator would decide the dispute.

11     Q      And that's one of the reasons why Xerox wanted to

12  implement an arbitration agreement, correct?

13     A      Reference -- I'm sorry.  Could you restate the

14  question?

15     Q      By eliminating access to the courts and eliminating

16  the possibility of a jury deciding employment disputes, that

17  was one of the aims of Xerox in implementing --

18            THE COURT:  And I -- just in terms of answering this

19  question, Mr. Harradine, it is appropriate to ask -- to answer

20  with respect to what was communicated to employees, but I don't

21  think there's any relevance and there might also be some

22  reasons why it wouldn't be appropriate to ask about internal

23  legal communications within Xerox.  I think the question is,

24  just you had testified about this in your direct as well, what

25  on this topic did Xerox communicate to employees?

UNITED STATES DISTRICT COURT

 1       Q       (BY MR. OSAKI:)  Well, one of those -- that

 2  problematic part of Mutual Arbitration Agreements was not

 3  communicated to employees through these rollout communications,

 4  right?

 5       THE COURT:  Why don't we -- since I intervened and

 6  rendered your question unclear, why don't you go ahead and

 7  reframe your question with my admonition in mind?

 8       Q       (BY MR. OSAKI:)  All right.  Xerox chose to outline

 9  three reasons to encourage employees to accept the Mutual

10  Arbitration Agreement, correct?

11       A       In the -- in the email, for example, D-1, I believe

12  there are three reasons delineated.

13       Q       One is the faster, more efficient process, correct?

14       A       That is correct.

15       Q       And one is it's used by other large companies?

16       A       That is correct.

17       Q       And Xerox has found or thinks that it is just as

18  fair as going to court?

19       A       Yes.  And I believe there's scholarship around that

20  as well from participants in arbitral proceedings who felt that

21  the fairness of the proceeding was a benefit.

22       Q       And I think one of the last questions, if not the

23  last question you answered from Ms. Linzy, was that you had a

24  hundred percent acceptance from the employees of this Mutual

25  Arbitration Agreement, correct?

1        A       I testified that to my knowledge no employee chose

2    to separate from the company in response to the MAA becoming a

3    term of employment as of May 15th.

4        Q       Same thing, right?

5        A       I -- that was my testimony.

6        Q       Now, Ms. Morgan in her deposition said that this

7    Mutual Arbitration Agreement was a big change at Xerox.  That

8    be fair to say?

9        A       I -- I can't -- I mean, Mr. Osaki, I manage Xerox

10   global litigation, so for me it was a big change, yes.

11        I -- I don't -- I can't speak for the other 9,000 of my

12   colleagues.  I can't speak to what Ms. Morgan felt or others

13   felt about the magnitude or lack thereof of this new term of

14   employment.

15        Q       Okay.  From Xerox legal, it's a big change?

16        A       Again, I can only speak for myself because I manage

17   the litigation in the United States, and it was a different way

18   of approaching litigation, employment litigation.  I can't,

19   again, speak for the rest of my colleagues in OGC.

20        Q       And Xerox is a global company?

21        A       Yes, sir.

22        Q       Got employees all over the world?

23        A       Most places, yes.

24        Q       And this arbitration agreement was going to be

25   applicable to all U.S.-based nonunion Xerox employees within

UNITED STATES DISTRICT COURT

1    the United States, correct?

2          A      That's correct.

3          Q      And so it affected over 9,000 people, right?

4          A      Yes, sir.

5          Q      So you guys had to think of a process to obtain

6    agreement to current employees for this new term, correct?

7          A      We had to -- yes, to add a new term of employment,

8    you need to have consideration under the laws of any of the

9    states in which we operate.

10         Q      Okay.  So in implementing the Mutual Arbitration

11   Agreement, you needed to comply with the law of 50 states,

12   correct?

13         A      I believe we have employees in all 50 states, but

14   I'd prefer to say that we had to comply with the laws of every

15   state in which an employee resided.

16         Q      And in Hawai'i in order to implement an agreement, a

17   change in terms like the Mutual Arbitration Agreement, you need

18   both notice and agreement, correct?

19         A      I wouldn't -- I wouldn't deign to make -- render a

20   legal opinion about Hawaiian law.

21          I am -- what I'm saying, as a general matter,

22   consideration is required for any change in the terms of

23   employment.  In this case it was continued employment.

24          THE COURT:  And, Mr. Osaki, I will also say it will

25   be for me to decide what the applicable law is, and I'm happy

UNITED STATES DISTRICT COURT

1    to hear you at sidebar if there's some reason why this is a

2    topic that you think bears on the factual questions.  But I

3    would ask you to focus on the factual questions that are in

4    dispute.

5         Q    (BY MR. OSAKI:)  The process to implement the

6    arbitration agreement was planned before it was rolled out,

7    correct?

8         A    Correct.

9         Q    So the language of the emails that would go out to

10   people managers and to the nonunion U.S. employees were all

11   done prior to sending them out, correct?

12        A    Yes, sir.

13        Q    And the reminders, the 7-day reminder and the 3-day

14   reminder if an employee had not completed the learning module,

15   that was also planned out first before it was rolled out,

16   correct?

17        A    Mr. Osaki, as I sit here, I don't know if those

18   overdue notifications were specifically contemplated in the

19   comms plan or are just generally sent from the GEMS system.

20        I know GEMS will generate a similar notification for

21   other overdue trainings.

22        As I sit here today, I cannot remember if there was

23   specific -- if that was a specific point in the comms plan or

24   just a general feature of the platform.

25        Q    And to be clear, Mr. Harradine, I'm not talking

UNITED STATES DISTRICT COURT

1    about notices that went out after May 15th, right?  I'm talking

2    about all the notices before May 15.

3        There was a 7-day notice that went out to, I guess, 200

4    people saying, Hey, you didn't complete the learning module

5    yet?  That -- that email was preplanned, right?

6        A    No.  I stand by my prior statements.

7        If you look at -- for example, Mr. Osaki, if you look at

8    the email dated May 8th, 2023, in Exhibit D-14, I believe that

9    to be a systems generated reminder that a mandatory training

10   has not been completed and is approaching its due date.

11       I do not recall as I sit here today that our comms plan

12   specifically envisioned all of these computer generated

13   reminders pre-May 15th.

14       Q    Okay.

15       A    Or if that's just a feature of the platform.

16       Q    I understand.  So once the process started rolling,

17   the computer knew what to do?

18       A    Yes.  So the templates that we reviewed earlier

19   today were given to the platform that sends out our

20   communications, and the computer, for lack of a better word,

21   knew when to send the information that we provide to it and

22   also what it was preprogrammed to send out in terms of

23   general -- excuse me -- training reminders.

24       Q    Now, you said that the learning module in GEMS was

25   mandatory, correct?

UNITED STATES DISTRICT COURT

1      A      Yes, sir.

2      Q      I mean, it's required?

3      A      Yes, sir, it was required.  It was mandatory.

4      Q      So 200 people couldn't do it, what happens to those

5  people?

6      A      What happens to them?

7      Q      They get reminded -- right? -- You didn't finish it?

8      A      They receive reminders, notification that they were

9  bound by the agreement despite their noncompliance with the

10  acknowledgement.

11      Q      Okay.

12      A      And then if there were communications with their

13  manager or some other person at Xerox, I'm afraid I don't have

14  particular knowledge of those.

15      Q      Okay.  So I want to separate the post May 15th

16  communications, all right?

17          So mandatory you take the learning module.  So before

18  May 15th, if you don't do it, you're just reminded to do it,

19  but that's it, correct?

20      A      You receive the initial notification and access to

21  the documents.  In the case of a people manager, you receive it

22  twice.  And then, yes, it was a series of reminders from the

23  GEMS system, yes, you have that right.

24      Q      All right.  Now, let's say somebody after May 15th

25  didn't see the notice, the specific notice that you had to quit

UNITED STATES DISTRICT COURT

1    by May 15th in order to not be bound by the arbitration

2    agreement, okay?  I want you to make that assumption, that

3    someone did not see that in writing anywhere, okay?

4         Now, after May 15th, they get this reminder email and

5    says, Oh, by the way, the arbitration agreement is in force and

6    in effect and you're bound.

7         They came up to you and said, "I never saw it."

8         What would the response be to this employee from Xerox?

9         A    You're asking me to speculate, Mr. Osaki?  I'm

10   afraid that didn't happen.

11        Q    Right, it didn't happen.  But if it did happen, the

12   response would be, "I'm sorry, you're bound, 'cause you're

13   still here," right?

14        A    Mr. Osaki, I'm afraid I don't quite know how to

15   answer that question since it didn't happen and I didn't plan

16   for that, I'm afraid.

17        Q    You can't imagine that happening, someone not having

18   read the notice that if you're here on the 16th, you'll be

19   bound?  Just didn't see it?

20        A    If you're asking me as I sit here today, Mr. Osaki,

21   I would find it hard that given the multitude of emails and

22   notification that went out through email in the GEMS system

23   that someone could have missed all that.  I guess I wouldn't

24   expect that.

25        Q    Eliminate the rollout, okay?  And you have the

1   Mutual Arbitration Agreement says what it says.  On the 16th of

2   May, Xerox sends out an email to all of its employees and it's

3   entitled big caps, Notice:  Mutual Arbitration Agreement,

4   that's Important, Please Read.  That's the Re line, Important,

5   Please Read.

6        Then the email itself says, Notice, and it's in large

7   font, different color, and it says, "Please be notified that

8   you are bound by a Mutual Arbitration Agreement and here it

9   is," and you put the text of the Mutual Arbitration Agreement

10  in the email.

11       Would that suffice to create a binding and enforceable --

12            THE COURT:  Sustained.  Sustained.

13       Mr. Osaki, you're now essentially asking Mr. Harradine

14  for his legal opinions on the legal issues that are before the

15  Court, but those are not for Mr. Harradine to offer testimony

16  about.  He was not designated, for example, as an expert on

17  legal matters, and generally speaking, courts don't allow that

18  kind of expert designation to begin with.

19       So I'll again admonish you please focus on the factual

20  issues that are before the Court.

21       Q    (BY MR. OSAKI:)  In D-13, which is the notification

22  to you from the IT department that Mr. Sexton did not complete

23  the learning module, this one in particular is dated July 6,

24  2023.  But your testimony is you got similar reports like this,

25  I think you said two of them, prior to May 15th, 2023; would

UNITED STATES DISTRICT COURT

1    that be correct?

2         A    No.  I believe, Mr. Osaki, I testified that I

3    recalled getting two reports.  As I sit here, I don't remember

4    if it was before or after May 15th.  It was certainly after the

5    rollout and I may have received additional reports.  I just --

6    as I sit here today, I'm having trouble recalling.

7             The point of these reports, though, was to give a

8    holistic status report of the amount of acknowledgements that

9    had been obtained and how many were outstanding

10   based -- divided by different functional units at Xerox.

11        Q    Right.  So the complete report is actually involving

12   over 9,000 people, correct?

13        A    It's an extensive spreadsheet, yes, sir.

14        Q    And I think your testimony was you didn't view all

15   the names, correct?

16        A    No, that's correct.  No, sir, I did not review all

17   of the names.

18        Q    And you didn't know whether or not prior to May 15th

19   whether Mr. Sexton had completed it or not completed it?

20        A    That's correct.

21        Q    So let's cut to the chase here.

22            Xerox Poppulo records show that Mr. Sexton did not see

23   the April 14, 2023, email to people managers which is page 1

24   and 4 of Exhibit D-14; is that correct?

25        A    You're referring -- are you referring to Exhibit

UNITED STATES DISTRICT COURT

1  D-2, sir?

2      Q    No, page 1 and page 4 of Exhibit D-14, 'cause this

3  is the version that has Mr. Sexton's name on it.

4      A    Right.  But I believe -- you asked about Poppulo and

5  I'm just trying to follow along.

6      Q    Maybe I didn't ask it artfully --

7      A    But I can speed it along.  Yes, the Poppulo records

8  do not indicate a click or an open for the April 14, 2023,

9  manager notice email.

10     Q    All right.  So we can -- the facts -- the fact is,

11  Mr. Sexton did not see or read the email of April 14, 2023,

12  right?

13     A    What Poppulo is telling us is that he didn't open

14  his instance.  That's what we can determine from Poppulo.

15          THE COURT:  Mr. Osaki, are you offering D-2, Exhibit

16  D-2?

17          MR. OSAKI:  No -- oh, yes.

18          THE COURT:  Okay.  Any objection?

19          MS. LINZY:  No, Your Honor.

20          THE COURT:  Okay.  Exhibit D-2 is admitted.

21          (Exhibit D-2 received into evidence.)

22          MR. OSAKI:  I'm sorry.

23     Q    (BY MR. OSAKI:)  And pages 2 and 3 of Exhibit D-14

24  is the April 19th email about the Mutual Arbitration Agreement.

25  This is the one that I believe shows it was opened I think

1   eight times or so?

2        A    Yes, sir, that's my understanding as well.

3        Q    And five of those times were within a minute?

4        A    Yes, sir.

5        Q    And another two of those times were within another

6   minute 20 minutes later?

7        A    17 minutes after the last open there was another

8   open -- yes, yes, sir.

9        Q    And, in fact, all these opens occur on the same

10  date, April 20th?

11       A    Yes, sir.

12       Q    And it doesn't say who opened it, right?

13       A    No.  Poppulo wouldn't capture that information.  All

14  we have is that the instance that was sent to Mr. Sexton was

15  opened.

16       Q    Now, the other thing we know is that Mr. Sexton

17  never clicked on the hyperlink to read the MAA, correct?

18       A    According to Exhibit D-9, he did not click the

19  hyperlink to access the MAA through the April 19th email, that

20  is -- that's what we can derive from Poppulo report.

21       Q    And we also know that Mr. Sexton did not click on

22  the hyperlink to the Frequently Asked Questions?

23       A    According to D-9, he did not click the link embedded

24  in the April 19th, 2023, email according to Poppulo.  Yes,

25  that's what it seems to indicate.

1     Q    And Mr. I think Ajdin or Ms. Morgan testified that

2  Mr. Sexton did not access the learning module which is

3  Exhibit 12 until sometime in June or July of 2023. Would you

4  have knowledge of that?

5     A    I would not. My knowledge on this would come from

6  the July 6th report that indicated the module had been -- had

7  been begun but not completed.

8     Q    And that would be my next question. It was never

9  completed, correct?

10    A    As of July 6th, 2023, it had not been completed.

11    Q    Right. And you don't know at what stage or how many

12  screens he had seen of the learning module, correct?

13    A    No. Once you begin the module, it marks it In

14  Progress. Whether you proceed mostly, partially, somewhat,

15  it's -- once you start the module and the audio begins, you're

16  in progress until you complete.

17    Q    Okay. And the distinction you make between the

18  98 percent of the over 9,000 nonunion U.S.-based Xerox

19  employees and the 200 or so, 2 percent --

20    A    Approximately.

21    Q    -- of those who did not acknowledge the MAA, that's

22  because those 200 people didn't hit the green button in the

23  learning module, correct?

24    A    They didn't complete the acknowledgement training

25  module, MAA 23, that's correct.

1      Q      And those 200 people as well as the rest of the

2    9,000-plus people in Xerox's view, they all had accepted the

3    arbitration agreement because they came to work on May 16th,

4    right?

5      A      I'm hesitant to give a legal answer, but as I said

6    before, my knowledge is no employee chose to separate instead

7    of being bound by the MAA.

8            MR. OSAKI:  Okay.  That's all I got.

9            THE COURT:  Okay.  Thank you, Mr. Osaki.

10        Ms. Linzy, any redirect?

11            MS. LINZY:  No redirect, Your Honor.

12            THE COURT:  Okay.  Does Xerox have any other

13    witnesses it would like to call?

14            MS. LINZY:  No, Your Honor.  Xerox will rest.

15            THE COURT:  Okay.  Give me one second here.

16        Okay.  Mr. Harradine, your testimony is complete and you

17    are excused.  Thank you.

18                  (End of partial transcript.)

19                        *  *  *  *  *

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawai'i, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10             DATED at Honolulu, Hawai'i, March 24, 2025.

11

12

13                        */s/ Debra Read*

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT